(78 South. 326)

No. 22069.

RICHARDSON v. LIBERTY OIL CO. et al.

(Jan. 28, 1918. Rehearing Denied April 1, 1918.)

*(Syllabus by the Court.)*

1. STATES ⚖191(2)—"SUIT AGAINST STATE"—SUIT AGAINST OFFICERS OR AGENTS OF STATE.

A suit by a citizen to recover possession of real property, or to enforce a real right, against officers or agents of the state, who assert title and possession in behalf of the state, is not a suit against the state, within the meaning of the Eleventh Amendment to the Constitution of the United States.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Suit against the State.]

2. DEDICATION ⚖19(5) — RIGHTS OF PURCHASER—BOUNDARIES.

Where a parcel of land is sold by a deed in which it is merely designated as "Lot No. III," according to a specified plan, and the plan shows it as bounded by other lots, variously designated, the boundaries of which are indicated by lines in nowise differing from each other, the purchaser acquires no greater rights of servitude, or otherwise, upon the theory of a dedication to public use, with respect to a lot, indicated by four parallel lines and bearing the legend "New Orleans Canal," than with respect to any other lot constituting his boundary.

3. DEDICATION ⚖13—CANAL CORPORATION—SERVITUDES OR INCUMBRANCES.

Act No. 18 of 1831, having established a corporation for the construction of a canal and a road along the side of it, with authority to acquire land for that purpose and charge tolls for the use of the canal and road, subject to the condition that the entire property should revert to the state, complete and in good repair, at the expiration of 35 years, and, in consideration of such reversion having exempted the capital stock of the corporation, fixed at $4,000,000, from all taxation by the state, or under its authority, for a period of 39 years, it would be absurd to suppose that it was within

the contemplation of the parties that the corporation should be able, by dedicating the property to public use, to make it free to the public, or, after enjoying the exemption during the prescribed period, to comply with its obligation in the matter of the reversion, by turning the property over to the state burdened with servitudes or other incumbrances established by the corporation for its own advantage.

4. CANALS ⬤⟿13—CANAL PROPERTY—MAINTENANCE—CLOSING OR OBSTRUCTING.

The New Basin Canal and Shell Road, with the strips of land on each side, are the property of the state, to be administered in the public interest, and, as the state required a road to be built on the west side of the canal, and has caused it to be maintained and kept open to the public for many years, it may very well be that rights have been acquired with reference to its maintenance which it would be necessary to consider if the road were now closed or obstructed. But what may be true in regard to the road has no application to the strip of land, or swamp, between the western edge of the road and the western line of the tract constituting the canal property.

5. CANALS ⬤⟿3—CONSTITUTIONAL LAW ⬤⟿ 20 — CONSTRUCTION BY LEGISLATIVE AND EXECUTIVE BRANCHES—CONSTITUTIONALITY OF STATUTE.

The legislative and executive branches of the state government having for 30 years interpreted the constitutional prohibition against the alienation or leasing of the "New Basin Canal and Shell Road and their appurtenances" as applying to the property so designated as a whole, and as inapplicable to the leasing of property unnecessary to the canal, and the court, being of opinion that such interpretation is admissible, accepts the same, and holds that Act No. 144 of 1888 and Act No. 60 of 1910, authorizing such leases, do not contravene said prohibition.

O'Niell, J., dissenting in part.

Appeal from Civil District Court, Parish of Orleans; George H. Théard, Judge.

Suit by William P. Richardson against the Liberty Oil Company and the Board of Control for the New Basin Canal and Shell Road to annul a contract whereby the Board leased to the Oil Company certain land, and to enjoin the lessee from occupying or improving such land. Judgment for plaintiff, and defendants appeal. Judgment annulled, and judgment rendered in favor of defendants rejecting plaintiff's demands and dismissing suit without prejudice to any party.

A. V. Coco, Atty. Gen., Harry P. Gamble, Asst. Atty. Gen., and McCloskey & Benedict, of New Orleans, for appellants. Edmond J. Jacquet, Max Hubert, and Mark M. Boatner, all of New Orleans, for appellee.

## Statement of the Case.

MONROE, C. J. The purpose of this suit is to annul a contract whereby the "Board of Control of the New Basin Canal and Shell Road" (a corporation created by the state and charged with the administration of the state property indicated in its name) leased to the Liberty Oil Company a parallelogram of land forming part of that property, to wit, "a certain piece of ground * * * situated on the west bank of the New Basin Canal, between Broad and Dorgenois streets, measuring 475 feet in length and having a width of 87 feet, beginning at a line 17 feet from the edge of the turnpike road and extending to the western line of the property of the state of Louisiana," and (by injunction) to prohibit the lessee from occupying, or erecting any buildings or works upon, or otherwise depriving plaintiff and the public of the free use of, the tract so leased.

Plaintiff alleges as his cause of action that he owns an undivided half interest, and is usufructuary of the remaining interest, in a square of ground, No. 589, which is "bounded" on one side by the "New Basin Canal and Shell Road"; that is to say (as alleged in another article), that adjoining petitioner's said property on the side towards the canal is a strip of land of about 120 feet in width from petitioner's property line to the water's edge, which, with a similar strip on the other side, extends along the entire length of the canal, and, with the canal itself, and all of its appurtenances, belongs to the state of Louisiana, having been acquired from the New Orleans Canal & Banking Company agreeably to the provisions of Act No. 18 of 1831, by virtue whereof that company was

created, and the canal constructed; that the company acquired large bodies of land, through which it caused to be laid off a tract 300 feet in width for the purposes of and through the middle of which it constructed a canal, leaving a strip of land 120 feet in width upon either side, and on the strip upon the "upper side" constructed a levee and road, as required by the statute mentioned, and that, after such survey and construction, it sold portions of the land lying outside of the 300-foot tract which had been so acquired—

"including petitioner's above-described property, which was sold by reference to a plan drawn by Charles F. Zimple, deputy city surveyor, on April 27, 1833, on which petitioner's said property was shown to adjoin said roadway, and thereby the said roadway and canal were shown and figured, said sale of petitioner's property being made to S. W. Oakey, petitioner's author; * * * from which it results that the said roadway and the whole of the space reserved therefor and for the service of said canal were irrevocably dedicated to said purposes, and to public use, and that a servitude in favor of such adjoining property was thereby created for the use by said adjoining proprietors and by the successive owners thereof of such public places for purposes of navigation, the loading and debarkation of freight, and similar related purposes, which said servitude includes the right of ingress and egress and of way to and over such spaces in aid of such purposes."

Assigning still further reasons therefor, he alleges that the lease in question will operate to divest his vested rights, impair the obligations of the contract whereby his land was acquired, and deprive him of his property without due process of law, in contravention of the public policy of the state and of the state and federal Constitutions, and he prays for judgment decreeing its nullity and enjoining defendants from acting under it. The oil company filed exceptions of estoppel, vagueness, inconsistency of allegation, and no cause or right of action, and the board, represented by the Attorney General (through his assistant), filed an exception to the jurisdiction of the court alleging:

"That defendant herein is merely the representative of the state of Louisiana in matters pertaining to the New Basin Canal and Shell Road, as set out in section 1 of Act 144 of 1888, as amended by section 1 of Act 60 of 1910; that the suit herein filed is, in truth and fact, a suit against the state of Louisiana, who cannot be brought into court without her permission; that respondent board is a creature of the law, brought into being by the act aforesaid; that it has no authority further than that given by said acts; and, under said acts, said board has no capacity to be sued, nor stand in judgment."

In the alternative, and in the event the court should maintain its jurisdiction, and reserving its rights with respect to its exception, the board then pleaded the same exceptions as its codefendant, and thereafter pleaded an exception to the jurisdiction ratione materiæ, which exception, as also that previously filed by the board, and the exception of no cause or right of action filed by the oil company, were overruled, and the others, by consent, were referred to the merits. Reserving the benefit of the exceptions so overruled, defendants then answered, setting up, inter alia, Act 78 of 1858 and Act 60 of 1910 as vesting in the board the authority to make the lease of which plaintiff complains, whereupon plaintiff, with leave of the court, filed a supplemental petition attacking those statutes as unconstitutional, to which it was excepted that it changed the issue and was inadmissible, which exception was overruled. There was then a trial on the merits, resulting in a judgment for plaintiff, from which defendants prosecute this appeal.

Act No. 18 of 1831 created the New Orleans Canal & Banking Company (hereinafter called the Company), and authorized and required it to excavate a navigation canal from some point in New Orleans, or its suburbs, to Lake Pontchartrain, a distance of perhaps six miles, through what was then a swamp, the inducement to the Company being that it should have the right to collect tolls from vessels using the canal and from persons, on horseback or in vehicles, using the road that was to be constructed upon the side of the

canal, and that its capital stock of $4,000,-000, should be exempt from state and municipal taxation during the life of its charter, i. e., until 1870.

Section 8 of the act required the construction of a canal 60 feet wide at the top of the water and of sufficient depth to admit vessels drawing 6 feet, with one or more basins, and a breakwater to facilitate the ingress and egress of vessels, and required the Company to keep the same in repair, and to begin the work within one year, and complete it within three, to be extended to six years under certain circumstances.

Section 9 authorized the Company to acquire land by agreement or expropriation, and, where it became necessary to resort to the course last mentioned, prescribed the form and manner of the proceeding, and included the following:

"Provided, that the proprietors of lands, so estimated and appropriated, shall always have the right to communicate with said route and canal, and this in the whole extent of said lands, which shall be considered as riparious to said canal."

Sections 11 and 12 related to the tolls to be charged to vessels and the manner of collecting them. Section 14 provided that the Company should build a levee upon the "upper side" (called "upper side" because it was up stream, considered with reference to the current of the Mississippi river, though, considered with reference to the compass, it was the west and southwest side), and should lay out a road thereon, not less than 25 feet wide, and cover the same with sand, shells, or other hard substance, so that it might at all times be suitable for carriages to travel upon, with a suitable draining canal on the upper side, and that it might establish tollgates thereon and collect certain tolls.

Section 26 reads:

"That from and after the expiration of thirty-five years after the passage of this act, the property in the said canal and road, with all the land on each side which it has a right to acquire by forced sale, * * * or otherwise, to the extent of 120 feet on each side of the canal, together with the machines and utensils belonging to the canal, as also the house of the toll receiver, shall be vested in the state of Louisiana, with all the rights to receive tolls therefrom, which are hereby granted to the said company, and in the situation required by the 8th and 14th sections of this act; and in consideration thereof the stock of the said company shall be exempt from taxation by the state, or by any parish or body politic, under the authority of the state, for the whole term of this charter."

Proceeding under the charter so granted, the Company found it expedient to cut the canal, for part of its length, through a portion of the swamp in the rear of the city which formed part of the "Macarty" plantation, and to that end to buy from one co-owner an undivided one half interest in the entire plantation, at the agreed price of $130,000, and from the other co-owners the other undivided half interest in the 300-foot tract through the middle of which the canal was to be excavated, and it thereafter excavated a canal according to the requirements of the statute, leaving a strip of land 120 feet in width on each side. On June 7, 1833, the Company, together with its owners in undivision (Messrs. Kohn, Millaudon, and Slidell), sold to Samuel W. Oakey a tract containing about 97 acres of the Macarty land lying beyond (to the southwestward) of the canal tract, the description according to which the sale was made being as follows:

"A lot or parcel of ground situated in this parish and designated by the No. 3 on plan drawn by Charles F. Zimple, D. C. S., on April 27, 1833, of that portion of ground designated and known as Macarty's plantation, and deposited in the office of said notary, which said portion of ground measures about 97 acres; it being understood that the said S. W. Oakey is in no way bound by the plan before referred to as to any of the lines purporting to be lines of the Nun's Suburb and Suburb Annunciation, which he declared to be wholly incorrect, but fully as to the extent and quantity of said lot No. 3; it being expressly understood that said vendors do not guarantee the title to the lot or parcel of ground above described."

Plaintiff has offered in evidence a reduced blueprint of the Zimple plan thus referred to, and we incorporate in this opinion a fairly accurate, though roughly prepared, copy of the same.

made in 1845 of land adjoining the canal tract, in which decisions it was held that the purchasers had acquired rights with reference to the canal or the strips of land upon either side of it by reason of the fact that

Plaintiff has also offered two reduced photographs of another plan by Zimple, drawn in 1834, on which there appears, upon the upper strip of the canal tract (that which adjoins the 97-acre tract of which plaintiff's land formed part), the legend: "Turnpike Road—Levee."

In 1852 and 1856, respectively, this court rendered certain decisions, in the cases of Keay and Bruning against Canal & Banking Company, predicated upon sales, based upon a plan which the Company had caused to be

the land was sold to, and purchased by, them, according to descriptions and with reference to a plan which represented it as abutting or fronting on the canal tract as a locus publicus; and whether for that reason or some other, the General Assembly in 1858 passed Act No. 78 of that session, the preamble of which, after reciting, in substance, the twenty-sixth section of the act of 1831 (supra), proceeds as follows:

"And, whereas, there is reason to fear that a portion of the land which the Company has

already acquired to the extent of 120 feet on each side of the canal, and which is necessary for the present use and purposes of the canal, its landings, road and basins, and for the future enlargement of the canal, which the wants of commerce already imperiously demand, may be incumbered and appropriated to other uses than those contemplated by the act aforesaid."

The act then declares that all the land acquired to the extent of 120 feet on each side of the canal "belonging to the said Company" shall be retained by it as trustee for the state, and devoted to the sole use and purposes of the canal, its landings, roads, basins, and its future enlargement and improvement; that the Company shall not give, sell, alienate, or dispose of, by lease or otherwise, any portion of the land on either side of the canal to the extent of 120 feet for any use or purpose other than described in the first section of this act, nor shall any person or body politic, or corporation, have power to use and appropriate any portion of said land, except for the purposes of police regulations; that, whenever it shall be deemed necessary for the city of New Orleans to occupy any portion of the 120 feet of land on either side of the canal for the purposes of a banquette in front of the property facing the road or landings of the Company, the banquette shall not exceed eight feet in width and shall be raised to the level of the Sauve crevasse of 1849, so as to protect the city from inundation; that the Company shall have power to enlarge the canal by widening the same and increasing the number and extent of the basins to the utmost capacity which the land owned by the Company may admit of, and to make such other improvements as may facilitate commerce:

"Provided, however, that it is the true intent and meaning of this act that all improvements made under the provisions thereof shall inure to the benefit of the state, in the same manner as is provided for in the charter of said Company."

In 1866 the entire canal property reverted to the state, as provided by the act of 1831, and, under Act 12 of 1866, was leased to Richard Taylor, with whom, agreeably to Act 118 of 1867, the state entered into another contract whereby he was authorized to widen the canal to 100 feet and construct additional basins, and in consideration thereof he was relieved of the obligation to make the payments required by the former contract. The fifth section of the act of 1867 reads:

"That at the expiration of said lease, all the improvements made to said canal and basins, and on land belonging to the state, or on lands purchased or expropriated, shall become absolutely the property of the state of Louisiana, without any claim of said lessee."

As we understand it, the canal was widened as contemplated by the contract last mentioned, and the basins were probably constructed, but the arrangement appears to have been unsatisfactory to the state; and on its termination, whether amicably or otherwise, an article was incorporated in the Constitution of 1879 (article 180), declaring that "the New Basin Canal and Shell Road and their appurtenances shall not be leased or alienated," and the General Assembly was required to provide for the appointment by the Governor of a superintendent, which it did, by Act 127 of 1880. By Act 144 of 1888, however, the board of control (defendant herein) was created and placed in charge of the property, and was authorized to "lease whatever property belongs to the Canal and Shell Road not necessary for their use," with the condition that "no lease of said property shall extend beyond their terms of office, without the advice and consent of the Governor."

The act also conferred upon the board the "capacity of suing," but stopped at that point, and did not confer the capacity to be sued, or to stand in judgment for the state, and those provisions have been re-enacted in Act No. 60 of 1910. The prohibition against the leasing or alienation of the "New

Basin Canal and Shell Road and their appurtenances" has been retained in the present Constitution (article 195).

It appears from the evidence and uncontradicted statement in the brief of the Attorney General that there are over 50 leases now in force, similar in character to that now under consideration (that is to say, of land lying upon the outer edge of one or the other of 120-foot strips which border the canal), from which the state, through the board, derives a revenue of about $14,000 per annum; that the board makes a monthly report of its receipts to the state treasurer; that its books are examined by the auditor of public accounts every three months, of which examinations reports are made to the Governor, and that reports of the affairs of the Canal and Shell Road are made to the General Assembly at its biennial sessions. It also appears that the leases are held by dealers in sand, gravel, shells, brick, lumber, and many other articles, the trading in which constitutes the commerce that is carried on through the canal and supplies the tonnage; and we find it plainly inferable from all the testimony that, other than as thus stated, the land so leased has never been used for the purposes of the canal, and has never produced any revenue to its owner. In fact, that which is the subject of the lease here in controversy had never been reclaimed from the swamp until it was filled and built upon by the lessee before the court.

## Opinion.

Upon the exceptions:

[1] The question first to be inquired into is whether the trial court was vested with jurisdiction to render the judgment appealed from, and whether this court has the power to affirm it. Upon that question it has been understood that the position of the learned Attorney General was at one time sustained by the jurisprudence of the Supreme Court of the United States, which is controlling upon the subject, but in United States v. Lee, 106 U. S. 196, 1 Sup. Ct. 240, 27 L. Ed. 171, that august tribunal handed down a decree based upon an opinion the substance of which, so far as it need be here stated, is expressed in the syllabus as follows:

"(1) The doctrine that the United States cannot be sued as a party defendant in any court whatever, except where Congress has provided for such suit, examined and reaffirmed, and the nature of this exemption considered.

"(2) This exemption is, however, limited to suits against the United States directly and by name, and cannot be successfully pleaded in favor of officers and agents of the United States, when sued by private persons for property in their possession as such officers and agents.

"(3) In such cases a court of competent jurisdiction over the parties before it may inquire into the lawfulness of the possession of the United States, as held by such officers or agents, and give judgment according to the result of that inquiry."

In reaching the conclusion thus stated the court had no occasion to consider the Eleventh Amendment to the Constitution of the United States, declaring that the judicial power of the United States shall not be construed to extend to any suits brought against one of the United States, by citizens of another state, or citizens or subjects of a foreign state, since the suit to be decided was not against one of the United States; but, in the later case of Tindal v. Wesley, 167 U. S. 218, 17 Sup. Ct. 775, 42 L. Ed. 142, in which plaintiff (Wesley) sued for the recovery of real estate held by the secretary of state of South Carolina and another as the property of that state, and the objection here set up by the board of control was urged by them, that court said:

"If a suit by an individual against individuals to recover the possession of property is not a suit against the United States merely by reason of possession being held by the defendants as agents of the United States and under title asserted to be in the government, we cannot perceive how the present suit can be regarded as one against the state merely because the defendants assert a right of possession in

the state through them as its officers and agents. The essential principles of the Lee Case have not been departed from by this court, but have been recognized and enforced in recent cases."

And the court cites several of the cases thus referred to, and proceeds to cite and consider a number of others in which the Eleventh Amendment was involved, and thus states the result:

"The settled doctrine of this court wholly precludes the idea that a suit against individuals to recover possession of real property is a suit against the state simply because the defendant holding possession happens to be an officer of the state and asserts that he is lawfully in possession on its behalf."

Applying that doctrine to the instant case, we can discover no difference in principle between a suit to recover possession of real property and a suit to enforce a real right in such property. We therefore conclude that the exception to the jurisdiction on the ground that this suit is against the state was properly overruled. We are also of opinion that the other exceptions were not, upon the face of the petition, well founded.

Upon the merits:

[2] It is admitted that the New Orleans Canal & Banking Company acquired an undivided half interest in the Macarty plantation, a body of land of much greater width than the tract 300 feet wide devoted to the Company's canal and roadway; that in June, 1833, it, with its co-owners, sold to S. W. Oakey, from the land so acquired, a certain lot "No. III," containing about 97 acres according to a plan by Charles F. Zimple, deputy city surveyor, of date April 27, 1833; that plaintiff's square, 589, formed part of that lot and fronted on the 300-foot tract upon which the canal and roadway, now known as the New Basin Canal and Shell Road, had then been constructed; that the blueprint filed in evidence by plaintiff is a correct copy of the Zimple plan of 1833; and that the abstract of title filed by plaintiff is correct. It is also admitted that the Company acquired the other half interest in the 300-foot tract. The description in the conveyance from the Company to Oakey gives the number of the lot and of the acres, and for the rest refers to the Zimple plan. Turning to that plan, we find that lot "III", bears the same relation to other contiguous property as to the canal property, and that neither the description nor the plan convey the slightest suggestion that it is entitled to a servitude upon one boundary more than another. The other parcels of land constituting the boundary are represented in the usual way, with the usual lines delimiting and separating them from lot III, and are designated, in some instances, by the names of the owners and, in others, by numbers, as I, II, IV, etc., with their acreage, and lot III is separated from the canal tract by a line differing in no respect from that which separates it from lot II, the canal tract being designated by four parallel lines extending beyond the confines of lot III in each direction indicating its subdivision into three parts, with the legend "New Orleans Canal" imposed upon the lines. No better method of designating or delimiting it occurs to us, and none less indicative of any intention to make a dedication of it to the public; and, as the tract formed part of a body of land in which the Company had bought outright an undivided half interest for $130,000, it is clear that such dedication did not, of necessity, result from its sale of adjoining tracts. A railway company may sell land adjoining its right of way without dedicating or imposing servitudes upon the strip so described, in which it owns but a limited fee, and equally may a canal company, or a canal and road company, sell land adjoining the tract upon which its canal and road are constructed, and of which it is the full owner, without of necessity subjecting such tract to servitudes in favor of its vendees, or the public. As appears from the foregoing statement of the case,

plaintiff alleges that the property now owned by him was sold "by reference to" the Zimple plan of April 27, 1833—

"on which petitioners said property was shown to adjoin said roadway, and thereby the said roadway and canal were shown and figured, * * * from which it results that the said roadway and the whole of the space reserved therefor and for the service of said canal were irrevocably dedicated to said purpose, and to public use, and that a servitude in favor of such adjoining property was thereby created, for the use by said adjoining proprietors and by the successive owners thereof, of such public places, for purposes of navigation, the loading and debarkation of freight and similar related purposes, which said servitude includes the right of ingress and egress and of way to, and over, such spaces, in aid of such purpose."

[3, 4] Those allegations of fact and the conclusion deduced therefrom find inadequate support in the Zimple plan, upon which the canal and road tract are represented, as we have stated, by four parallel lines with the words "New Orleans Canal" inscribed upon them, the space in width occupied by them on the blueprint being less then an eighth of an inch, thus:   ~~New Orleans Canal~~   The word "road" does not appear.  The Company was obliged by its charter to construct a road not less than 25 feet wide, which would leave a space of 95 feet between it and the line between the 120-foot strip and the adjoining land, and it is not pretended that any wider road has ever been constructed, though the rest of the strip was, no doubt, to be devoted to the purposes of the canal, as the owners and administrators might deem advisable, and not to the free use of the adjoining proprietors or the public.  It is true that section 9 of the charter, after authorizing the Company to acquire land by agreement or by estimation" and "appropriation," contained the proviso:

"That the proprietors of land so estimated and appropriated shall always have the right to communicate with said route and canal, and this, in the whole extent of said lands, which shall be considered as riparious to said canal."

That proviso has, however, no application to the land involved in this suit, which was acquired by purchase, and it does not appear in this record that the Company acquired any land otherwise than by purchase; but, if it had acquired all the land needed for the canal and road by expropriation (or "estimation" and "appropriation"), we apprehend that some difficulty would have been found in reconciling its right and obligation to administer the property with the privileges thus granted to the adjoining proprietors.

It is worthy of remark that though the grant is special, and is by its terms confined to the expropriated proprietors, the plaintiff, whose author was not in that class, is claiming about the same privileges, merely upon the face of the Zimple plan.  And our conclusion upon that point is that the Zimple plan does not sustain the claim.  Extending the inquiry beyond the plan to the law constituting the contract between the canal company and the state and defining the powers and obligations of the Company, we find what appears to us a grave reason why the Zimple plan should not have subjected the canal property to the servitude claimed by plaintiff or otherwise have incumbered it.  Under that law and contract, the Company was obligated to surrender the entire canal property to the state at the expiration of thirty-five years, free of incumbrance.  We use the expression "free of incumbrance," though it is not found in the statute, because we are of opinion that it should be read into it by necessary implication, and because the statute was so interpreted by the General Assembly in Act 78 of 1858, and that interpretation has never, so far as we are informed, been questioned.  The state, by the act of 1831, declared that, in consideration of the reversion of the property to it, "the stock of the said company [fixed at $4,000,000] shall be exempt from taxation by the state, or by any parish or body politic, under the authority of the state, for the whole term of this charter [a period of 39 years]," and it would be absurd to suppose that it entered into the contemplation of

either party that, after enjoying that exemption, the value of which in cash may have exceeded the value of the property to be surrendered, the Company should be able to discharge its obligation in the premises by turning over to the state property rendered valueless by reason of mortgages and servitudes to which it had been subjected. The statute itself declared that it should revert to the state "in the situation required by the 8th and 14th sections of this act," meaning, clearly, completed and in good repair; and that it should be unincumbered with respect to obligations incurred in the interest of the Company goes without saying. Where, then, did the Company find the authority to make any dedication of property which it held under such conditions? Where did it find the authority, in order to sell its adjoining land, to concede to its vendees rights and servitudes in or upon property, which, according to the law and to its contract with the state, was to revert to the state free of incumbrance? And where would the courts find the authority to obstruct the state in its administration of its own property by sustaining the claims of those to whom such rights and servitudes were attempted to be conceded?

We are referred by learned counsel to the cases of Keay v. N. O. Canal & Banking Co., 7 La. Ann. 259, and Bruning v. N. O. Canal & Banking Co., 12 La. Ann. 541, from which it appears that in 1845 the Company caused a certain body of land which it owned adjoining the canal tract, and through which the canal survey had probably been projected, or made, as in the instant case, to be laid off into squares and lots, and had made sales thereof at public auction by reference to colored lithographs of a plan representing them as abutting as upon public places, on the 120-foot strips on the sides of the canal, and that the plaintiff, having purchased some of the property so offered, complained in the one case that the Company had thereafter cut a ditch or draining canal within three feet of his line, and in the other that it had converted what was represented to be a landing and locus publicus into a basin both of which complaints were held to be well founded and entitling the plaintiff to relief, though the court took occasion to intimate, in the case first mentioned, that it was not dealing with the interests of the state, but only with the interests of the parties who were before it, viz. the plaintiff and the Company. One of the cases was decided in 1852, the other in 1856, and in 1858 the General Assembly enacted the statute containing the declaration that there was reason to fear that the canal property might be "incumbered" or appropriated to other uses than those for which it was intended, and prohibiting its alienation, leasing, etc.

The cases have no particular application here; they arose out of sales made in accordance with a plan that came into existence in 1845, and showed lots and squares abutting on, or surrounded by, streets, whereas the Zimple plan, on which plaintiff relies, shows merely tracts of land, of various dimensions, the one bounding, but not abutting on, the other. The interests of the state were not represented or considered in either of the cases.

Our attention is also called to the cases of State of Louisiana v. N. O. City & Lake R. Co., 104 La. 685, 29 South. 312, and Board of Control v. H. Weston Lumber Co., 109 La. 926, 33 South. 923. In the case first mentioned the Attorney General and associate counsel brought suit in the name of the state and of the board of control for nearly $80,000, alleged to be due for the use and occupancy of land on the northeast side of the canal upon which defendants' track was laid, and it was held that there could be no recovery, for the reason that the road had been built, as by legislative sanction, on public land, after due notice, and had been there

maintained without objection or claim for compensation during a period of 23 years; also that Act 84 of 1882, authorizing the building and maintenance of railroads on public lands, was so far applicable to the case as to prevent recovery. On rehearing it was said that plaintiffs could not collect rent because the renting of the property was prohibited by the Constitution.

In the case last mentioned the board of control brought suit, on behalf of the state, for the recovery of a parcel of land forming part of the canal tract of which defendants were alleged to be in possession, asserting title. Defendants answered that the parcel never belonged to the state, or, if it ever so belonged, that the state was estopped to assert its title by reason of its acquiescence in defendants' possession under a perfect title for more than 30 years. It was held by this court that the vendor of the original defendant had no title by purchase, could have acquired none by possession, and could have conveyed none to defendants, who were in the attitude of obstructing a public road. Defendants traced their title to a tax sale made by a constable in 1859 under the supposed authority of Act 285 of 1858. It was held that the act conferred no authority to sell any part of the canal tract, 300 feet in width, and, moreover, that the sale included no part of that tract.

It appears, therefore, that in both cases what was said to the effect that the land constituting the 300-foot tract was a public highway, in the ordinary sense of that term, was beyond the requirements of the occasions, and that the various matters which have now been brought to the attention of the court were not considered.

Plaintiff, through learned counsel, contends that the Constitution prohibits the leasing of the "New Basin Canal and Shell Road and their appurtenances." That contention and the assumption that plaintiff has the stand-ing to urge it are predicated upon the theory that the 120-foot strips of land upon either side of the canal are public highways, the obstruction of which any abutting proprietor has the right to enjoin in so far as it may inconvenience him, and more particularly where the obstruction of which he complains is expressly prohibited. But these strips, considering each of them as a whole, are not public highways in the ordinary sense of that term. The whole tract, 300 feet in width, with the canal and the strips, is state property, to be administered by the state government in the public interest, the asset of paramount importance in which is the canal, and if, in the opinion of the state officials vested with its administration, it were deemed advisable to consume the whole of the strip on the east side in widening the canal, or to occupy it entirely with landings, or freight sheds, or destroy its continuity with basins, we can discover no reason why those steps should not be taken. As to the strip on the west (on "upper") side, the law requiring the company to build and maintain a road upon it not less than 25 feet in width has never been repealed. The road has been maintained by the state since the reversion of the property, and it may very well be that rights have been acquired with reference to its maintenance which it would be necessary to consider if it were now closed or obstructed. But what may be true in regard to the road has no application to the strip 95 feet in width which should be found between the western edge of the road and the western line of the 300-foot tract constituting the canal property. That land, or, as is mostly the case, swamp, belongs to the state, just as the canal belongs to it, and, whatever may be the power of the state with respect to its ultimate destination, we are unable to discover that it is subject to any mortgage or servitude imposed or conceded by the Company in favor of any individual. It has re-

mained for, say, 85 years, unreclaimed from the swamp, idle and unproductive, of no use to the canal, to the owners of the adjoining land, or to the public, and so long as it remains unfilled must be a detriment, rather than an advantage, to such land; the testimony to the effect that, by affording access to the road and canal, it adds to the value of the land, being predicated upon the assumption that it may be filled by the state, and opened to the adjoining proprietors, neither of which steps can the state be compelled to take.

Mr. McWilliams, real estate dealer, called by plaintiff, gave the following testimony on cross-examination:

"Q. Were you there before the Liberty Oil Company filled up that ground? A. Yes, sir. Q. It was all swamp land out there? A. Yes, sir. Q. Who was on it; anybody? A. It wasn't being used; no, sir."

Mr. Zander, a civil engineer, called by defendants, was shown a map of survey which he said had been made by him of the square of ground here in question, and gave the following testimony concerning the same to wit:

"Q. Was it a physical survey of the property? A. Yes, sir. Q. What was the character and nature of the ground immediately contiguous to the paved shell road and the new basin canal? A. It was a willow swamp."

Plaintiff could not, therefore, reach the road from any point immediately in front of his square, even though the Liberty Oil Company had erected no building. If the streets on each side of his property extending back at a right angle from the canal tract are filled, he could, no doubt, reach the road and canal in that way, but, as we understand, his property has not been in use for some time, and it is not likely that he has concerned himself about the streets.

[5] Assuming, however, that he discloses sufficient interest to authorize his attack upon the constitutionality of Act 144 of 1888 and Act 60 of 1910, which authorize the board of control to lease whatever property belongs to the canal and shell road not necessary for their use, "subject to the condition that no lease of said property shall extend beyond their terms of office without the advice and consent of the Governor," there is a good deal to be said by way of answer to the argument in support of that attack. The constitutional prohibition against the alienation or lease of the "New Basin Canal and Shell Road and their appurtenances" is susceptible, we think, of the construction that it was intended to be applied to the alienation and lease of the property as a whole, and not to prevent the board from disposing to the advantage of the state of articles which, worn out by use, could never be of any further service, or of leasing parcels of land such as that here in question, which have never been, and otherwise never will be, so far as can at present be known, either useful or productive. Moreover, the statute has now been in force for nearly 30 years, during which period, after a lapse of 22 years, the provision in question was re-enacted, and has at all times been sanctioned by the executive as well as the legislative departments of the state government, to which constant reports of its operation have been made. Beyond that we have had two constitutional conventions, many of the members of which, no doubt, were fully aware of the interpretation which had been placed upon the prohibition, and, though the prohibition itself has been retained, that interpretation appears to have been acquiesced in, so that, all the circumstances considered, we are of opinion that the attack on the statutes mentioned should not be sustained, and that plaintiff's demand should be rejected and his suit dismissed. In conclusion we think it proper to say that, as the parcel of ground leased to the oil company is described as "having a width of 87 feet, beginning at a line 17 feet from the edge of the turnpike paved road and extending to the western line of the

property of the state of Louisiana," it would appear either that the strip of land left on the west side of the canal is 129, instead of 120, feet in width, or the road 16, instead of 25, feet in width, or that the lease encroaches upon either a street, or defendants' land, on the west side of the 300-foot canal tract, and that it is not the purpose of this judgment to sanction either a reduction in the width of the road, which the General Assembly has declared shall be not less than 25 feet, or an encroachment by the board of control upon land that is not included in the canal tract.

It is therefore ordered and decreed that the judgment appealed from be annulled, and that there now be judgment in favor of defendants, rejecting plaintiff's demands, and dismissing this suit at his cost in both courts, without prejudice, however, to the right of any one who may have an interest so to do to inquire into, and to have determined, the question, whether the lease here complained of includes property necessary to a road 25 feet wide on the upper side of the canal, or property which is not part of the canal tract.

O'NIELL, J., concurs in the opinion that this is not a suit against the state, but is of the opinion that the entire strip of land 120 feet wide above the canal was dedicated to public use for a state highway, and that the statutes purporting to authorize the board of control to lease the part not necessary for the canal or shell road are unconstitutional.