Acting under what it considered to be its authority by virtue of Sec. 60 of Art. 7 of the Constitution of 1921, the Legislature, at its regular session in the year 1936, enacted Act No. 8 by which it purported to create the offices of assistant district attorneys in and for the 25th Judicial District of Louisiana.
The constitutional provision referred to reads as follows: "Ineach judicial district, the Legislature shall have the power to create and provide one or more assistant district attorneys, said assistant district attorney to be selected and appointed by the district attorney of said judicial district, subject to removal at his discretion, and commissioned by the Governor." (Italics ours.) The act of the Legislature referred to reads as follows: "Be it enacted by the Legislature of Louisiana, That the offices of Assistant District Attorneys are hereby created in and for the Twenty-fifth Judicial District of Louisiana, one for the Parish of Plaquemines, and one for the Parish of St. Bernard, under the provisions of article VII of the Constitution of Louisiana, relative to assistant district attorneys, and an annual salary of Seven hundred and fifty ($750.00) Dollars shall be paid each one of said assistant district attorneys by the police jury of his parish, on his monthly warrant."
The provision in the act for the payment of salaries by the parish police jury of each parish is authorized by Sec. 62 of Art. 7 the Constitution, which also fixes a salary of $750 per annum to assistant district attorneys thus created, payable by the State monthly on their own warrants. That section reads as follows: "The assistant district attorneys shall each receive a salary of seven hundred and fifty dollars per annum, payable by the State monthly on his own warrant, and such additional salary as the Legislature may fix, to be paid by the police jury of the parish, or pro rata by the police juries of the parishes of the judicial district."
Acting on the authority purportedly conferred upon him by the act of the Legislature, the District Attorney for the 25th Judicial District, on August 6, 1936, appointed Bruce Nunez, relator in one of these consolidated suits, as assistant district attorney for the Parish of St. Bernard within the 25th Judicial District of Louisiana, as appears from his letter of that date making the appointment, and on the same day, he named and appointed Rudolph M. McBride as assistant district attorney for the Parish of Plaquemines, in the same manner. On that same day he notified the Governor of the State of his appointments of both Rudolph M. McBride as "Assistant District Attorney for the Parish of Plaquemines and Bruce Nunez, as Assistant District Attorney for the Parish of St. Bernard."
On August 10, 1936, R.W. Leche, then Governor of Louisiana, commissioned both relators, the commission to Bruce Nunez naming and appointing him as "Assistant District Attorney, Parish of St. Bernard" and the one to Rudolph M. McBride, "Assistant District Attorney, Parish of Plaquemines." On August 31, 1936, each of the relators took the oath prescribed by law, Nunez as "Assistant District Attorney in and for the Parish of St. Bernard", and McBride as "Assistant District Attorney in and for the Parish of Plaquemines."
Each then entered upon the discharge of his duties, apparently, and each regularly drew the monthly warrant for his salary on the State Auditor, which was duly honored and paid by the State Treasurer. The appropriation for the payment of that part of the salaries to be paid by the State was regularly made each time the Legislature had to make the same, being embodied in the General Appropriation Act under the heading "Judiciary Department", listed as No. 6 in the Appropriation Act of 1940 and carried in globo in one item as "salaries of seventeen assistant district attorneys." (See Act 44 of 1940.) In the General Appropriation Act for the year 1942, Act 266 of that year, the salaries are carried under the heading "Judiciary," which is listed as No. 4 as in the case of all assistant district attorneys, and the particular salaries here involved are listed as "Salaries of Assistant District Attorneys * * * Twenty-fifth Judicial District *Page 652 
two (2) Assistant District Attorneys at $750.00 each per annum." The total amount of the appropriation is $1,500 for the biennium 1942-1943 and $1500 for the biennium 1943-1944. In August of that year, when each of the relators drew his respective warrant for that portion of his salary due and payable by the State on the State Auditor, the warrants were returned unpaid for the reason, as appears on the notation found thereon, that the appropriation therefor had been vetoed by the Governor. As a matter of fact the veto appears in the reported act itself.
In the present suits which have been consolidated for the purpose of trial, the relators are seeking redress in the courts, through writs of mandamus, to have the State Auditor honor their warrants and the State Treasurer pay the same, contending that the action of the Governor in vetoing the appropriation was unconstitutional, null and void for various reasons. Most of the reasons have reference to the action of the Governor in withholding his approval of the General Appropriation Bill until after the Legislature had adjourned, and waiting until then to veto the appropriation made for their salaries without giving the Legislature the opportunity of repassing the same over his veto, all as is contended, is provided for in the Constitution, under Sec. 16 of Art. 5. That article reads: "The Governor shall have the power to disapprove of any item or items of any bill making appropriations for money, embracing distinct items, and the part or parts of the bill approved shall be law, and the item or items of appropriation disapproved shall be void, unless repassed according to the rules and limitations prescribed for the passage of other bills over veto."
The other reason, which seems to be the only one that is now relied upon, arises out of the fact that the Governor singled out a specific part of what relators claim to be Item No. 4 under the heading "Judiciary" in the Appropriation Bill of 1942 and that as he could not single out any particular part of an Item, but had to veto a whole item, which in this case constituted the item with reference to the "Judiciary", all as is also contended, is provided for in Sec. 16 of Art. 5 of the Constitution, he therefore violated the provisions of that section and it follows that his action was unconstitutional, null and void. (Italics ours.)
In the Constitutions prior to that of 1921, after providing the method by which bills could be passed over the Governor's veto, it was further provided that "if any bill shall not be returned by the Governor within five days after it shall have been presented to him, it shall be a law in like manner as if he signed it, unless the General Assembly, by adjournment, shall prevent its return, in which case it shall not be a law." See Art. 76, Consts. 1913-1898. This last provision seems to have been consistent with the then existing provision in Art. 57 of the same Constitutions, and which is precisely the same as found in the present Constitution of 1921, under Sec. 11 of Art. 4, ordaining that "all appropriations, to be valid, shall be passed and receive the signatures of the President of the Senate and the Speaker of the House of Representatives five full days before adjournment sine die of the Legislature." The evident purpose of requiring all appropriation bills to be passed and signed by the presiding officers of the respective chambers of the Legislature five full days before final adjournment, was to have them in the hands of the Governor so that he could consider them within that period and return them to the Legislature with his approval or disapproval either of the whole or of any part or parts thereof, and the Legislature then would have time in which to act upon his veto. If he did not return any such bill within the five days prescribed it then became a law the same as though he had signed it. Under the present Constitution however, notwithstanding the fact that it still retains the requirement that all appropriation bills have to be passed and signed by the President of the Senate and Speaker of the House five full days before adjournment of the Legislature, it is further provided in Sec. 15 of Art. 5, that the "Governor shall have ten calendar days after any bill shall have been presented to him within which to approve or veto it; * * *." (Italics ours.) No exception is made with regard to appropriation bills and if the Governor chooses to withhold his approval or disapproval of any such bill or of any item or items in any, for five additional days after adjournment, the Legislature is then powerless to act on his veto. Regardless of what inconsistency, we believe, may appear in these different provisions we cannot construe the plain language of Sec. 15 of Art. 5 otherwise than meaning that the *Page 653 
Governor is given ten calendar days after any bill, including appropriation bills, has been presented to him, in which to approve or veto the same and that if he vetoes it within that time, after adjournment of the Legislature, the veto must stand unless it is found to be unconstitutional on some other ground such as is urged in these proceedings.
The relators having made the State Auditor and State Treasurer the defendants in their mandamus proceedings instituted the same in the District Court of the Parish of East Baton Rouge, or as it is well and officially known in the District Court of the Parish, where those State officers have their respective domiciles. To the respective petitions the defendants filed four exceptions: One to the jurisdiction of the court ratione personae; one to failure to state the domicile of the respondents; one to their right to a writ of mandamus, and one being an exception to the jurisdiction of the court ratione materiae and of no right or cause of action, coupled together. Under reservation of these exceptions they then filed their answers in which they present the main issue contended for by them, and which arises perhaps under the exception of no right or cause of action also; that is, that Act No. 8 of 1936 which purported to create the offices of assistant district attorneys of the 25th Judicial District is unconstitutional in that it violates Sec. 60 of Art. 7 of the Constitution as it created an assistant district attorney for each of the respective parishes of the said judicial district. They admit that the relators have been paid their salaries by the State up to the month of July, 1942, but deny that they were entitled to the same and further deny that the Governor's act in vetoing parts of the General Appropriation Bill referred to in his veto as "Schedule No. 4" was illegal, unconstitutional, null and void.
All of the facts which have heretofore been stated are admittedly those which existed prior to the veto of the salaries of the relators by the Governor on July 12, 1942, and also those immediately following, that is the refusal of the State Auditor to honor and of the State Treasurer to pay the warrants drawn by the relators for their salaries for the month of June, 1942. Following that, the term of office of the District Attorney for the 25th Judicial District expired and of course with the expiration of his term the appointment of the purported assistant district attorneys also came to an end. The District Attorney was re-elected in November, 1942, and qualified in the month of December of that year. On December 10, 1942, he wrote each of them a letter of appointment following practically the same form as his original appointment and he also notified the Governor, as he had done before, asking him to issue a commission to each. This time, however, the Governor, who is the present Governor, Sam H. Jones, in issuing the commissions, made the same in the name of each appointee as "Assistant District Attorney, 25th Judicial District." In taking their oaths however, they again took the same, Nunez as "Assistant District Attorney, 25th Judicial District, Parish of St. Bernard" and McBride, "Assistant District Attorney, 25th Judicial District, Parish of Plaquemines."
After hearing the rules for mandamus, the district judge who had previously referred all the exceptions to the merits, overruled them all and then rendered judgment in favor of the relators making the writs peremptory in each case and ordering the respondents to honor and pay the relators' respective warrants for their salaries all as prayed for by them. From each judgment the respondents took an appeal to the Supreme Court but on finding that it was without jurisdiction because of the amount involved in each, that court transferred the appeals to this court. See State ex rel. Nunez v. Baynard and State ex rel. McBride v. Baynard et al., 203 La. 711, 14 So.2d 611.
We think it is proper to discuss and pass on the exception of failure to state the domicile of the respondents first, for if that was a fatal error, it is, in our opinion, the first of any of the errors alleged to have been committed under the exceptions and if that exception should be sustained, the relators' suits cannot be proceeded with any further. We find, however, that there is no merit in this exception for although the relators did fail to state in their respective petitions what was the domicile of the two respondents, they are nevertheless designated as the Auditor and the Treasurer of the State of Louisiana and they are here being impleaded in their official capacities as such state officers. The court can very well take judicial and official cognizance of the fact that as such State officials they have their domiciles, and their offices are located, *Page 654 
in the City of Baton Rouge, Parish of East Baton Rouge, and as such the district court for that parish has jurisdiction over them as it is the court of their official domiciles. In the case of Graham et al. v. Jones et al., 198 La. 507, 3 So.2d 761, 768, in considering an exception to the jurisdiction of the court ratione personae, the court was influenced by the prayer of the petition which showed that both the same officials as are herein sued, were being sued in their official capacities only (the very situation that exists in this case), and it held that that had cured the defect in the petition in failing to have alleged that they have their offices and domiciles in the Parish of East Baton Rouge. The court further stated in support of its ruling: "Moreover, the trial judge took judicial notice of the fact that the domiciles of the State Auditor and the State Treasurer are in the Parish of East Baton Rouge," which is what the district judge did in these cases also. For these reasons we are of the opinion that that exception was properly overruled.
Next in order we believe we should consider the exception to the jurisdiction of the court ratione personae as the point therein involved goes to the very heart of the case in relation to the question as to who is the real defendant in the suits. Naturally if this is a suit against the wrong defendant the relators have no standing in court.
The proposition raised under this exception is that the real defendant is the State of Louisiana and not L.B. Baynard, State Auditor, and A.P. Tugwell, State Treasurer, and it is further contended, as the corollary of that proposition, that as the State cannot be sued without its consent, and no consent having been obtained, the court has no jurisdiction to entertain the suit.
We cannot understand how it can be urged that this is a suit against the State of Louisiana, as the only part the State itself took in this matter was in providing in its Constitution that the Legislature could create the offices of assistant district attorneys. Acting on that authority, it then, through its Legislature, at least attempted to, if in fact it did not create, the two offices purportedly held by the two relators and provided for the salaries that were to be paid to each by that same law. The function of the State after that was to provide the funds for payment of those salaries, which it also did. Through its constitutional and legal machinery, the two state officials herein sued are the designated parties through whose offices all salaries have to be paid and, in considering this exception, regardless of the action of the Governor in having vetoed the appropriation, it is their action in refusing to pay their salaries which these relators claim they are justly entitled to be paid, that is the subject of this suit. The part which the State took in the matter therefore is ended, and, for the purpose of considering this exception, we are concerned purely with the mechanics through which the relators should be paid, and properly, in our opinion, they have made the parties who operate the machinery, the defendants in their suits.
In the case of State ex rel. Brenner v. Noe, Governor,186 La. 102, 171 So. 708, 712, the question which we are now considering came before the court in the form of an exception to the jurisdiction of the court ratione materiae. The court reviewed several cases and some of the older ones which held that in such instances the suit was one against the State itself, were indirectly overruled. It concluded by saying: "Suffice it to say that the later jurisprudence of this state and the correct view are in accord with safer and sounder conceptions of public policy." One of the latest cases cited by the court was that of Richardson v. Liberty Oil Co., 143 La. 130, 78 So. 326, in which it has been held that a suit by a citizen to recover possession of real property or to enforce a real right against officials or agents of the State who asserted title and possession in behalf of the State, is not a suit against the State. True it is that in this case we are not concerned with real property or the enforcement of a real right but it strikes us that the principle involved is very much the same. In Abbott et al. v. Louisiana Securities Commission, 149 La. 354, 89 So. 211, 212, Syllabus No. 3 reads as follows: "A suit by the officers of a corporation to recover possession of stock delivered to the State Securities Commission in escrow and wrongfully retained by the Commission after the termination of the escrow is not a suit against the state for which the state's consent is required." There plaintiffs were trying to enforce, not a real, but a personal right as the court refers in the body of the opinion to the suit being one against an agency *Page 655 
of the State to compel this agency to give up some movables which it is unlawfully refusing to give up. (Italics ours.) Under the allegations of the petition of the relators in these cases, which, for the purpose of considering this exception must be taken as true, no judgment is sought against the State and none can be rendered against it. The suit is against two officials of the State to compel them to pay relators their salaries which they are allegedly unlawfully withholding, and the only judgment, if rendered in their favor, can be one compelling them to pay. We are of the opinion that this exception was also properly overruled.
This takes us now to a consideration of the exception to the right of relators to the writ of mandamus and much of what has been said in discussing the exception to the jurisdiction of the court ratione personae might apply in disposing of this exception also. The principal point involved is whether these respondents, namely the State Auditor and the State Treasurer, are here being sued to have them perform a duty which is ministerial as contradistinguished from a duty in which they exercise some discretionary power. Considering the set up which we have already outlined concerning the State's part in the matter, it strikes us that it is plain that the duty which these officials are being called on to perform is purely ministerial. In passing on this exception, the allegation that the Governor's action in vetoing the appropriation is unconstitutional, null and void, must be taken as true. If the veto is unconstitutional, null and void it follows that these respondents have no other alternative but to carry out the ministerial duty imposed upon them by law, which is to honor the warrants drawn by the relators and pay them their salaries which have been appropriated by the Legislature. In the case of Cook v. City of Shreveport, 163 La. 518, 519,112 So. 402, 404, the court recognized, as settled, the proposition that mandamus will lie to compel a public officer to perform a plain duty, made ministerial by the provisions of a statute, and stated further: "The duty of a public officer does not become less ministerial, when plainly devolved upon him by statute, directing him to perform an act in regard to which no discretion is committed to him, although the statute may require, in some degree, a construction of its own language by the officer." Even that much discretion, if such it may be called, was not required of the officials in the present cases as there was no construction of any statute involved. We are of the opinion therefore that this exception was also properly overruled.
The exception to the jurisdiction of the court ratione materiae, coupled with the exception of no right or cause of action, are concededly so involved with the merits of the cases that they can be disposed of on a consideration of the merits. Under them is brought up the question, first, as to the right of the court to inquire into the action of the governor in exercising his veto power.
There have been no cases cited as authority under which the power of the court was either denied or restricted in investigating such a question. The weight of authority seems to be that in the exercise of his power of veto the Governor acts in a rather strange and unusual capacity. It is generally held that he is not acting in his executive capacity and whilst most of the authorities seem to hold that he is acting conjointly with the Legislature, still it is held, in some cases, that strictly speaking his action is not altogether legislative. To legislate means to enact laws or pass resolutions in a constructive direction. On the other hand by his veto of a law the Governor acts in a sort of destructive capacity. In other words he attempts to destroy that which the Legislature has created. Naturally when there is such a sharp conflict in the powers of two of the co-ordinated branches of government as develops under a situation like this, some power has to exist to determine the rights of each and most naturally and logically that power is found in the Judiciary. It would not seem reasonable to say that in such a contest where the very material rights of the individual citizen or of an important branch of the government itself is concerned, and may have its very existence at stake, that the matter would have to remain in statu quo simply because the Governor, in the exercise of his power of veto, destroyed an act of the Legislature upon which that individual or that agency of the government depended, without the Legislature having had the right to pass on the veto, such as is the situation existing in this and most states today. Besides, although they are not numerous, there are several cases from many jurisdictions in which the courts have considered and *Page 656 
passed on the right of veto of certain appropriations by the Governors of those states in which they arose. Cases of this character are cited and relied on by both sides in these proceedings, and from our consideration of them all we are satisfied that the court is vested with jurisdiction in the matter.
The next question which arises under these exceptions is one involving the constitutionality of Act 8 of 1936 which purported to create the offices now claimed to be held by the relators. We think it proper to pass on that question now, for if that act is unconstitutional they held no such offices and are therefore not entitled to the salaries they claim.
Applying a literal and a strict construction to Sec. 60 of Art. 7 of the Constitution, there may be said to be something in favor of the contention that the act does not meet the requirements of the provisions therein embodied. The section ordains that the Legislature shall have the power to create and provide one or more assistant district attorneys in each judicial district
whereas the Act of 1936 seems to go a little beyond that. It creates two assistant district attorneys for the 25th Judicial District but further provides that one of them shall be for the Parish of Plaquemines and the other for the Parish of St. Bernard. The intention of the lawmaker may well be surmised as no doubt he wanted to be sure that one of the assistants would come from each of the two parishes comprising the judicial district. We doubt, however, whether the Legislature, following the clear provisions of the Constitution, had the right to make any such provision. That was a matter of policy which may well have addressed itself to the district attorney who had the power of appointing such assistants under him. On the other hand it may well be said that the act did create the offices of two assistant district attorneys in a judicial district as it specifically provides that they are hereby created in and for the 25thJudicial District of Louisiana. Up to that point the act is clearly constitutional and complied with the provisions of Sec. 60 of Art. 7 of the Constitution. Could not the rest of the act therefore be said to be surplusage, and that in placing the other provision it did something which might very well be ignored by the district attorney in making his appointment? In recent years the Legislature itself has provided in several statutes that if any part shall be held or construed to be unconstitutional that shall not affect or impair the constitutionality of other provisions which are constitutional. We do not think that such a requirement is necessary in the act itself for it follows as a matter of constitutional interpretation. In the case of City of Alexandria v. Hall, 171 La. 595, 131 So. 722, 724, the court stated: "It is well settled that a statute may be valid in part * * *, and that the invalid part may be disregarded altogether and the other part constitute a valid statute, if the two parts are not so intimately connected as to raise the presumption that the Legislature would not have enacted the one without the other." (All italics ours.)
In the present cases moreover, as shown by the pleadings, these two relators had been acting in their capacities as assistant district attorneys for some six years prior to the date of the filing of these proceedings. As a matter of fact they had served a whole term as such and had been re-appointed by the District Attorney and commissioned by the same Governor who vetoed the appropriation for their salaries. During their first term of six years they had been paid regularly on the warrants drawn in the same manner that the present warrants were drawn, and it is rather significant that, in issuing their commissions upon their re-appointment, in December, 1942, the same Governor who vetoed the appropriation for their salaries, issued them their commissions then in the proper manner to each as an assistant district attorney of the 25th Judicial District. These are facts which perhaps may be said to give rise to some form of estoppel, which it is doubtful could be urged in these cases, but we think that they present rather persuasive argument also on the question that that part of the act of 1936 which created them as assistant district attorneys for the 25th Judicial District is constitutional to that extent at least, regardless of the further requirement which it may have imposed that one should be for one Parish and the other for the other Parish. We believe that as so created and appointed, and now commissioned by the Governor, either one had the right to go into either of the two parishes and there discharge the functions of the office of assistant district attorney, regardless of which Parish he had his residence in. (Italics ours.)
As we are satisfied that these relators were properly constituted, and are each *Page 657 
holding the office of an Assistant District Attorney for the 25th Judicial District, we are now led to a discussion of the final and vital point in the case, that is, the right of the Governor to have vetoed the appropriation for their respective salaries after it had been so appropriated by the Legislature in 1942.
The point raised by the relators is that an item of appropriation under the Constitution consists of a mass or whole
appropriation for any one department or agency of the State and that the power of the Governor to veto any item or items of any bill making appropriations for money, as contained in Sec. 16 of Art. 5 of the Constitution, is restricted to such appropriations made en mass or as a whole, and he cannot veto the specific items of detail in which such appropriation is broken or divided. In other words, it is contended that in this instance the Governor could not single out the item of $1,500 making a specific appropriation for the Judiciary Department, but that if he wanted to exercise his power of veto with regard to the said mass item, he would have had to veto the judiciary appropriation as a whole. There devolves then upon the court the duty of interpreting the language of Sec. 16 of Art. 5 of the Constitution which, unfortunately, in our opinion, is rather ambiguous.
The section reads as follows: "The Governor shall have the power to disapprove of any item or items of any bill making appropriations for money, embracing distinct items, and the part or parts of the bill approved shall be law, and the item or items of appropriation disapproved shall be void, unless repassed according to the rules and limitations prescribed for the passage of other bills over veto." Section 9 of Art. 4 of the Constitution is the one which makes provision for the general appropriation bill. It reads as follows: "The general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the government, pensions, the public debt and interest thereon, public schools, public roads, public charities and all State institutions; and such bill shall be so itemized as to show for what account each and every appropriation shall be made. All other appropriations shall be made by separate bills, each embracing but one object."
It is to be noted that the general appropriation bill must be so itemized as to show for what account each and every appropriation is made. The account may well mean any one of the entire appropriations to be made for any one of the objects to be embraced in the bill, such as the different departments of government, public schools, different State institutions, etc., and that being so, would not the different items in which that account must necessarily be carried, constitute such "item or items of appropriation" which the Governor has the power to disapprove? Such construction would favor and tend to support the action of the Governor in these cases as his veto might be said to have been of one of the items of the account relating to the judiciary, one of the departments of the government.
This is a different approach to the question than is found in any of the cases we have read on the subject. It may be because the article of the Constitution in each of the States in which the cases arose, which prescribed the manner in which the general appropriation bill shall be made, is different from that appearing in the Constitution of this State. No reference is made to the same. The decisions all rested on an interpretation of the words "item or items of appropriation" or of others of the same import, found in the articles of the Constitution giving the Governor the power of veto over them. But even confined to that interpretation, we find that there is a lack of harmony in the cases from different jurisdictions and the decisions themselves are nearly all by divided courts. This divergence of opinion is borne out by the following excerpt from Ruling Case Law, Vol. 25, p. 891, sec. 142: "A constitutional provision that the governor shall have the power to disapprove any item or items of any bill making appropriations containing distinct items, and the part or parts of which bill approved shall be the law, and the item or items of the appropriation disapproved shall be void, has been held to give the Governor power to veto a distinct fractional part of an item, and even to reduce the amount of a given item; though this view has been rejected and it has been held that such a provision does not carry the power to disapprove a part of a distinct item and approve the remainder." The leading case cited under the view as laid down is that of Commonwealth of Pennsylvania ex rel. Elkin v. Barnett, State Treasurer, reported in 199 Pa. 161, 48 A. 976, 55 L.R.A. 882. This case is strongly relied on *Page 658 
by counsel representing the respondents herein. The case cited as rejecting that view is Fergus v. Russel, 270 Ill. 304, 110 N.E. 130, Ann.Cas.1916B, 1120. Supporting the view that the Governor's power of veto is restricted to whole items of appropriation is also the Mississippi case of State ex rel. Teachers, etc., v. Holder, State Auditor, reported in 76 Miss. 158, 23 So. 643.
It is observed that in the Pennsylvania case of Commonwealth v. Barnett, supra, the court was not without doubt on the question of its own interpretation of the language of the Constitution of that State which is almost identical with the language in the article of our own Constitution on the subject. After disposing of authorities from other States by saying that they afforded no assistance, and after also indicating that the question had never before been presented for judicial determination in Pennsylvania, it states that the practice in that State was nevertheless not new. The court cites three instances where different Governors had vetoed parts of whole appropriations and then refers to their action in doing so as a principle of executive practice which must be considered as settled. It holds of course that the executive interpretation of its own powers is not binding on the judiciary but has to be considered as persuasive and entitled to great respect, and where, as in that State, the practice had been frequent and not objected to for a number of years, the Governor's action should be very clearly shown to be unconstitutional before it is declared so by the court.
The same argument is presented in these cases but unfortunately for the respondents, although in former years some of the Governors had vetoed certain specific items of whole appropriations and their action seems never to have been questioned, the power of the Governor in this respect seems to have been interpreted exactly the opposite by the present Governor who is generally recognized as a very able lawyer, all as is shown by his message in connection with his consideration of the general appropriation bill. The Legislature, he points out, could have made reductions uniformly and could have reduced each item proportionately, but he could not. "I must veto entire items," he states, "The Constitution so provides." His statement that he "must veto entire items" finds strong support in the following language used by the court in the Illinois case of Fergus v. Russel, supra [270 Ill. 304, 110 N.E. 147, Ann.Cas.1916B, 1120]: "We think it is clear that the power given the Governor by the Constitution to disapprove of and veto any distinct item or section in an appropriation bill does not give him the power to disapprove of a part of a distinct item and approve the remainder. To permit such a practice would be a clear encroachment by the executive upon the rights of the legislative department of the state. By the constitution the powers of government of this state are divided into three distinct departments — legislative, executive, and judicial — and no person of collection of persons, being one of these departments, shall exercise any power properly belonging to either of the others, except as in the Constitution expressly directed and permitted. The legislative branch of the government is vested with the discretion to determine the amount which should be appropriated for any particular object. The Governor, as the chief executive of the state, is given the right to approve or disapprove of the action of the Legislature in making such an appropriation. He may disapprove of it for the reason that in his judgment no appropriation should be made for such a purpose, or for the reason that the amount appropriated is too large, or for any other reason satisfactory to him, but he has not the right to disapprove of a certain portion of an item appropriated and approve of the remainder, and thus perform a function which belongs exclusively to the legislative branch — that of using the discretion necessary to determine the amount which should be appropriated for any particular object. * * *"
The last statement in the foregoing quotation induces another thought which keeps recurring to us throughout our consideration of the question herein involved and that is concerning those appropriations about which the Legislature has no discretion; in other words, appropriations which have to be made for the payment of those State salaries that are fixed in the Constitution. Section 5 of Art. 5 of the Constitution ordains that the Governor "shall receive a salary of seven thousand five hundred dollars per annum * * *." Obviously, in our opinion, the Legislature, in making up the general appropriation bill at each biennial session, has no alternative but to follow the mandate of the Constitution and make the necessary appropriation *Page 659 
for such salary. In like manner, as we have already stated, section 62 of Art. 7 of the Constitution ordains that assistant district attorneys "shall each receive a salary of seven hundred and fifty dollars per annum, payable by the State * * *." Again, we say, the Legislature has no other alternative but to make the necessary provision therefor in the general appropriation bill. And if the Legislature can exercise no discretion in the matter and has no other alternative than to carry out the provisions of the Constitution, we cannot understand from what source the Governor could derive the power to use his own discretion and change or annul its action. True it is that Sec. 16 of Art. 5 which gives him the power "to disapprove of any item or items of any bill making appropriations for money" makes no exceptions with respect to any kind of appropriation but it seems to us that exceptions with regard to appropriations for constitutional salaries are implied, for otherwise the power of the Chief Executive in vetoing such items would be greater than the Constitution itself which ordains that such salaries shall be paid.
In all the cases we have been able to find on the question that is presented none involved the veto of an appropriation made for the payment of an official's salary. They all had to do with the veto of appropriations or items of appropriations made for certain State agencies, departments or institutions of some kind, in all of which it would appear, the Legislature had the right to use discretion either as to the nature of the appropriation itself or as to its amount. It is with regard to such items of appropriation, we believe, that the Governor can exercise whatever power is given him under Section 16 of Art. 5 of the Constitution in approving or disapproving them, and we are fortified in this opinion by the remarks of the vetoing Governor himself in these cases in his veto message which we have already referred to.
In commenting on his power of veto, he states: "This confines my veto power to whole items of certain agencies which, in the main, are limited to welfare and relief, hospitals and institutions, and state colleges and trade schools. * * * Noconstitutional and statutory salaries can be vetoed. The judiciary cannot be vetoed. Appropriations for constitutional agencies cannot be vetoed." (Italics ours.) How then, in view of this so strongly expressed opinion he could proceed to veto the salaries of the relators herein which are fixed in the Constitution, we are unable to understand. If he was correct in his opinion, as we have concluded he was, it follows that his veto was unconstitutional, null and void, as it was held to be in the judgment appealed from.
A separate decree affirming the judgment in each case will be handed down, the one that follows to serve in the case of State of Louisiana ex rel. Bruce Nunez v. Ludlow B. Baynard, Jr., Auditor, and Andrew P. Tugwell, Treasurer of the State of Louisiana, in which it is now ordered that the judgment appealed from be and the same is hereby affirmed at the costs of the defendants, appellants therein.