## DECKER v. NEW YORK LIFE INS. CO.

No. 5908.   Decided February 21, 1938.   (76 P. 2d 568.)

*Critchlow & Critchlow* and *A. W. Watson,* all of Salt Lake City, for appellant.

*M. E. Wilson* and *R. C. Wilson,* both of Salt Lake City, for respondent.

WOLFE, Justice.

Appeal from a judgment of $3,220 in favor of plaintiff as beneficiary of a life insurance policy issued to her deceased husband, Feramorz Decker. Judgment was on the pleadings. Plaintiff demurred to defendant's answer on the ground that the answer did not state facts sufficient to constitute a defense. Defendant elected to stand on the demurrer. Consequently, judgment was entered for plaintiff. The facts, therefore, as pleaded in the answer, must be taken as true in order to determine whether in law they constitute a defense. The answer annexed and incorporated what it alleged to be a full and true copy of the policy sued on. The questions raised are purely legal.

Feramorz Decker, husband of plaintiff, took out a life insurance policy with defendant for $5,000, executed on June 7, 1922, calling for a premium of $117 per annum payable on the first day of June each year. His wife, the plaintiff, was named the beneficiary. The premium included $5 per annum for double indemnity resulting in death by accident, and $7.05 for disability benefits. In

1924, the method of payment of premiums was changed from annual to quarterly; the deceased paying the sum of $31 quarterly from then on to June 1, 1935. He failed to pay the quarterly premium due on September 1, 1935. On October 26, 1935, he delivered the policy to and requested defendant to pay him the cash surrender value. The cash surrender value as of September 1, 1935, was $660. There was an indebtedness against the policy of $407.48. Decker died on November 3, 1935, eight days after delivery of the policy and before the defendant paid him the net surrender value of $252.52. These facts are admitted by the pleadings. The plaintiff, beneficiary under the policy, sued for $3,000 remitting and renouncing all sums over $3,000. This was for the purpose of keeping the case in the state courts and obtaining the state appellate court's opinion on the law points involved.

Plaintiff took the position that the insurance at the death of the insured was still in force for the full face of the policy, subject only to deduction of loans and balance of an annual premium up to June 1, 1936, and sued for $3,000 of that amount. The defendant in its answer set up the delivery of the policy to the company together with the request for payment of its net surrender value and claimed that this showed a complete surrender by the insured during his lifetime after default in payment of the quarterly premium due September 1, 1935, under the provisions contained in the policy; that such surrender terminated the policy and all rights of the beneficiary, and entitled insured or his personal representative to the surrender value only less the loan due to the company. It will probably conduce to understanding to set out at this point the provisions of the policy pertaining to surrender. These provisions will not be again repeated in full in this opinion, but will be referred to later. The provisions so far as applicable to this case read as follows:

"Section 4—Surrender Values

"After three full years' premiums have been paid, the Insured may,

at the end of any insurance year or within three months after any default in payment of premium but not later, surrender the Policy, and

"(1) Receive its Cash Surrender Value; or

"(2) Receive the amount of non-participating paid-up insurance which the cash surrender value at date of default less any indebtedness hereon will purchase, payable at the same time and on the same conditions as this Policy, but without disability or double indemnity benefits. The Insured may at any time obtain a loan on such paid-up insurance, or surrender it for its cash surrender value; or

"(3) If the Policy be not surrendered for cash or for paid-up insurance within three months after default in payment of premium, its cash surrender value at date of default, less the amount of any indebtedness, shall automatically purchase Continued Insurance from the date of default for the face of the Policy plus any dividend additions and less any indebtedness to the Company. The Continued Insurance shall be without future participation and without the right to loans, cash surrender values, disability or double indemnity benefits.

"The Cash Surrender Value shall be the reserve on the face of the Policy at the end of the insurance year, or in event of default, at the date of default (omitting fractions of a dollar per thousand of insurance) and the reserve on any outstanding paid-up additions, plus any dividends standing to the credit of the Policy, and less a surrender charge for the third to the ninth years, inclusive, of not more than one and one-half per cent of the face of the Policy. * * *"

The plaintiff sought to parry the force of the defendant's contention as above outlined by the following contentions: (1) That the policy rights of the beneficiary could not be canceled without her knowledge or consent, and that since the insured had attempted to do so, the delivery of the policy with request for payment of its surrender value was ineffective; that she therefore, as beneficiary, had the right to collect on the policy after his death. (2) That the delivery of the policy for surrender was made more than three months after the insured defaulted because the default occurred on June 1, 1935, and not September 1, 1935; that, therefore, paragraph (3) of section 4 of the policy, above set out, became automatically effective; that thereby continued insurance was in effect in favor of the beneficiary

when the insured died November 3, 1935. (3) That even though the "Surrender" was within three months of the date of default, the policy was not terminated until the money was "Received," and that therefore on the death of the insured the policy rights remained in the beneficiary. (4) That the option in the policy contract to "Surrender" the policy and "Receive" its cash surrender value while insured was in default for nonpayment of premium was not valid in law because section 1161, Comp. Laws Utah 1917, in force at the time said contract was made, prohibited such provision.

It will be noted that if the plaintiff is correct in any one of these four propositions, the lower court's ruling sustained her demurrer to defendant's answer and thereupon, on defendant's refusal to plead over, giving judgment in favor of plaintiff is correct. If, on the other hand, there could be and was a completed valid surrender and termination of all rights under the policy except the right to receive the money, the ruling of the court and the judgment were wrong, and the case must be reversed.

We think the defendant's position is correct and that plaintiff must fail in all four of her contentions. A treatment of plaintiff's contentions will necessarily show why we reach the affirmative conclusion that defendant's position is correct. Fortunately, such treatment will not be difficult for the reason that both sides and amicus curiae have furnished us with very helpful briefs.

We shall first take up the fourth of the above propositions and follow with the second, for any conclusion we reach as to the first and third is subject to the more fundamental question as to whether the surrender provisions was itself valid and whether, if valid, it had been timely exercised.

Does that part of section 4 of the policy permitting surrender after default for its cash surrender value offend against sections 1154 and 1161, Comp. Laws Utah 1917, now, with inconsequential changes, sections 43-3-24 and

43-3-26, R. S. Utah 1933? Section 1154 reads, in part, as follows:

"Provisions in life policies. On and after January 1, 1910, it shall be unlawful for any foreign or domestic life insurance company to issue or deliver in this state any life insurance policy unless the same shall contain the following provisions: * * *

"6. A provision which shall fulfill the requirements of § 1161."

Section 1161 reads as follows:

"Default in payment of premiums. 1. In the event of default in payment of any premium due on any policy, provided that not less than three full years' premiums have been paid, there shall be secured to the insured without action on his part as specified in the policy, either paid-up insurance or extended insurance or the application of the net value of the policy as a loan in payment of future premiums, so long as such net value, less the deduction herein provided for, is sufficient to secure such loan with interest added at a rate not exceeding 6 per cent per annum, payable annually in advance; the net value applied to one of the options above provided for shall be at least equal to the entire net reserve held by the company on such policy, including dividend additions, if any, less 2½ per cent of the amount insured by the policy and dividend additions, if any, or one-fifth of such reserve, and less any outstanding indebtedness to the company on the policy at the time of default.

"2. No agreement between company and policy-holder or applicant for insurance shall be held to waive any of the provisions of §§ 1160 and 1161, except as herein provided."

The attack by plaintiff on the validity of the surrender provision is twofold: (1) That it could not be placed in the policy under the statute as it then existed; and (2) that the insured could not, under the law, select just one of the provisions contained in section 1161, such as extended insurance (called continued insurance under section 4 of the policy), and contract that the net value remaining, on default, be used up in the manner of the selected provision, but that the policy itself must contain the three provisions.

We think the inclusion of the provision permitting the insured to obtain from the company the net value of this policy in cash after default is just as valid a provision after

default as before. If there is a failure to pay premiums on or before the date they are due or within the grace period, the policy lapses. The contract is not wholly terminated, but the obligations of the company assumed on issuance give way to those under section 4 of the policy and the provision regarding reinstatement. The policy is alive as to these provisions only. There is nothing in the law which expressly prohibits the company from giving options exercisable after default in addition to those required to be in the policy, if such additional options are not inconsistent with the automatic nonforfeiture provision of the policy. Nor is there anything which by implication prohibits it. There is no reason why an insured, where consent of the beneficiary is not required, cannot cash in on his policy after default as well as before default. The automatic nonforfeiture provisions were for the purpose of giving the insured value received for the net value of his policy after default when he failed to take action himself, to prevent the insurer from forfeiting policies without in some way providing that the reserve against the policy be used to the insured's benefit. *Succession of Watson* v. *Metropolitan Life Ins. Co.,* La. App., 156 So. 29. This does not by implication prevent the insurer from contracting with the insured that the latter may by his own action have some additional options which he may deem beneficial to exercise. He is not required to exercise them. There is nothing in the law which requires an insured to remain insured after default until his reserves are used up in further insurance. *Henricks* v. *Metropolitan Life Ins. Co.,* 7 Cal. 2d 619, 61 P. 2d 1162.

Section 1154, subsec. 7, provides that the policy shall contain a table showing in figures the options available under the policy each year upon default of the premium payments. It is reasonable to conclude that the section recognized the validity of alternate methods given to the insured for using his reserve, other than one of those required to be contracted for under section 1161 in case the insurer took no action in reference to his reserve. Appar-

ently the state authorities have permitted policies containing the option to surrender after default to be issued for a long period of time. This administrative construction of the law over a long period of time is persuasive of its correctness.

We also conclude that section 1161 only required the insurer to include in its policy one of the named automatic nonforfeiture provisions. It permitted the insurer and insured to contract as to any single one of the three methods therein outlined for the reserve to be used for the benefit of the insured if he did not move in the matter. *Henricks* v. *Metropolitan Life Ins. Co.*, supra; *Succession of Watson* v. *Metropolitan Life Ins. Co.*, supra. The Utah statute is not to be considered incorporated in policies of insurance as part of the contract but as an injunction on the insurer to include one of the automatic nonforfeiture provisions in the policy. *Henricks* v. *Metropolitan Life Ins. Co.*, supra; *Straube* v. *Pacific Mutual Ins. Co.*, 123 Cal. 677, 56 P. 546. The California cases are in point. It is not necessary to decide as to the consequences of the insurer omitting all of these three provisions of the policy, because in the case at bar the policy did provide for continued insurance in the case of nonaction by the insured for three months after default. The Missouri cases cited by respondent were under statutes different from ours. *Valenti* v. *Prudential Ins. Co.*, 8 Cir., 71 F. 2d 229, illustrates the difference between the Utah and Missouri statutes before the amendment of the latter. Our statute is not susceptible to the meaning respondent would give it. If all three modes of applying the policy reserve to the benefit of the insured were included in the policy, the automatic feature would disappear because it would not be known "without action on his [the insured's] part" which method should apply. We think the respondent's argument that the words "without action on his part" refer to a securing of the net value and not the method of applying the reserve is not tenable. Section 1161 does not provide for creation or recognition

of the net value of the policy. That was already in existence. It provides for the securing of its use by one of the modes designated in the statute in case the insured does not act.

The second proposition advanced by respondent, that the default occurred on June 1, 1935, rather than September 1st, need not long detain us. The change from annual to quarterly payments was made in 1924 and adhered to ever since. The policy provides that the insured may be permitted to pay semiannually or quarterly by agreement in writing. No rider is attached to the policy showing in writing this change, but the insured and insurer long acted on this basis. Since the requirement that the change be made in writing was primarily but the benefit of the insurer, its recognition of the quarterly basis of payment must be considered a waiver of the writing. *State Life Ins. Co.* v. *Finney*, 216 Ala. 562, 114 So. 132. At all events the insured or his beneficiary could not assert that the lack of writing made the quarterly payment of premiums for ten years a breach of the contract by him in order to found an advantage on such alleged breach. All that was required of the insured was to pay the installments as they became due. This he did until September, 1935.

The theory advanced by plaintiff that the premium was due on each anniversary date, to wit, June 1st, and that the permission to pay quarterly was like the period of grace, was an indulgence granted by the company in allowing deceased to string out the payments, is fallacious. If it was an "indulgence," it was one contracted for by the parties and one which the insured, upon payment of the extra $7 per year, perhaps had a right to obtain. At all events, when one agrees with another that a certain total annual sum may be paid in installments in pursuance of a previous stipulation that such agreement may be made, by no stretch of the imagination can it be said that there was a default until one of the installments was not paid. Any other reason-

ing would lead us into the paradoxical assertion that the company agreed that what was a default should not be considered a default as long as the quarterly payments were made, which again must result in the conclusion that there was no default if the quarterly payments were timely made. We have no doubt that the default of the policyholder in this case took place on September 1, 1935, and that his surrender was made within the three months of said default. *Thompson* v. *Fidelity Mutual Life Ins. Co.*, 116 Tenn. 557, 92 S. W. 1098, 6 L. R. A., N. S., 1039, 115 Am. St. Rep. 823; *Nixon* v. *Travelers' Ins. Co.*, 25 Wash. 254, 65 P. 195.

We now consider respondent's propositions (1) and (4). The first is that the policy could not be surrendered by the deceased without the consent of plaintiff, the beneficiary named in the policy. (1) The policy provided for the payment "to Rhoda A., wife of the insured, Beneficiary (with the right on the part of the Insured to change the Beneficiary in the manner provided in Section 6), Five Thousand Dollars (the face of this policy) upon receipt of due proof of the death of Feramorz Decker, the insured." (2) The policy provided (section 6) that the insured may at any time change the beneficiary by written notice to the company, accompanied by the policy for indorsement of the change thereon, but unless such change was indorsed thereon the change should not take effect. It further provided that, "in the event of the death of any beneficiary before the insured, the interest of such beneficiary shall vest in the insured." (3) The policy contained the stipulation that, "The Insured may, without the consent of the Beneficiary, receive every benefit, exercise every right and enjoy every privilege conferred upon the Insured by this Policy."

There was no provision in the policy that the beneficiary could not be changed except with her consent. In view of all these provisions, we think the policy is like a trust in which the trustor grants property to a trustee, naming a beneficiary and reserving the right to revoke the trust at

any time during his life, or change the beneficiary at will. The insured could borrow on the policy, permit it to lapse, surrender it both before and after lapse, without consent or consultation with the beneficiary. It is not necessary to go into any discussion of the nature of the beneficiary's rights—whether vested, contingent, inchoate, or in expectancy. Those words represent different conceptions. Whichever one may be adopted to describe the nature of the beneficiary's interest cannot alter the fundamental principle that her rights were subordinate to the rights of the insured, one of which was to surrender the policy for its reserve value less amounts owing.

*Indiana National Life Ins. Co.* v. *McGinnis,* 180 Ind. 9, 101 N. E. 289, 45 L. R. A., N. S., 192, cited in the case of *Reserve Loan Life Ins. Co.* v. *Sumner,* 70 Ind. App. 472, 123 N. E. 443, and the Reserve Loan Life Case itself, *Mutual Benefit Life Ins. Co.* v. *Willoughby,* 99 Miss. 98, 54 So. 834, Ann. Cas. 1913D, 836; *Sullivan* v. *Maroney,* 76 N. J. Eq. 104, 73 A. 842; *G. P. Farmer Coal & Supply Co.* v. *Albright,* 90 N. J. Eq. 132, 106 A. 545; *Anderson* v. *Broad Street Nat. Bank,* 90 N. J. Eq. 78, 105 A. 599, were cases where the terms of the contract did not permit the insured to take the cash value without consent of the beneficiary, or involved questions between the assignee of the policy and the beneficiary when the beneficiary had not been changed. The case of *In re Simmons,* 1 Cir., 255 F. 521, 523, expressly mentions *Blinn* v. *Dame,* 207 Mass. 159, 93 N. E. 601, 20 Ann. Cas. 1184, and distinguished it because in the latter case the "insured had reserved 'power to surrender the policy at any time and receive for his own benefit the amount of the then existing surrender value.'" Where the policy provides "that the insured may without the consent of the beneficiary receive every benefit, exercise every right and enjoy every privilege conferred on the insured by this policy," it includes the right to surrender the policy and receive the cash surrender value. The language, "In the event of the death of any beneficiary before the insured the in-

terest of such beneficiary shall vest in the insured," did not by implication vest in the beneficiary rights which could not be destroyed by the insured exercising the rights which his very contract with the insurer permitted him to enjoy or exercise independently of the beneficiary's consent. One of these rights given by the policy was to surrender it and obtain the reserve, and this existed before and after default. *Blinn* v. *Dame*, supra; *Knoche* v. *Mutual Life Ins. Co.*, 1934, 317 Pa. 370, 176 A. 230, recognizes the above construction. The case of *Entwistle* v. *Travelers' Ins. Co.*, 1902, 202 Pa. 141, 51 A. 759, cited by respondent, is silent as to whether the policy gave the insured untrammeled power to exercise his rights independently of the children. The implications of the decision are that it did not. *Mallon* v. *Prudential Ins. Co.*, D. C., 5 F. Supp. 290; *Leeker* v. *Prudential Ins. Co.*, 154 Mo. App. 440, 134 S. W. 676, affirmed 163 Mo. App. 523, 143 S. W. 1197; *Stahel* v. *Prudential Ins. Co.*, 189 Minn. 405, 249 N. W. 713.

In the last case the court distinctly holds the rights of the beneficiary to be vested, but also holds such vested interest subject to all the rights given the insured under the policy. It distinguishes those cases where the policy gave no right to the insured to borrow, and those in which it did, stating that the beneficiary's rights were subject to the expressed policy right of the insured to borrow from the defendant on security of the policy in accordance with its terms. This was in recognition of the general principle that the rights of the beneficiary are subject and subordinate to the policy rights given to the insured.

The following authorities hold that where the policy reserves the right to change the beneficiary, the latter does not have a vested interest but has a mere expectancy: Couch on Insurance, Vol. 2, p. 309; Cooley's Briefs on Insurance, 2d Ed., Vol 7, pp. 6406 and 6408; *Massachusetts Mutual Life Ins. Co.* v. *Bank of California*, 187 Wash. 565, 60 P. 2d 675; *Goodale* v. *Wilson*, 134 Me. 358, 186 A. 876; *Davis* v. *Metropolitan Life Ins. Co.*, 285 Ill. App. 398, 2 N. E. 2d

141; *Tromp* v. *National Reserve Life Ins. Co.*, 143 Kan. 98, 53 P. 2d 831; *Belknap* v. *Northwestern Mutual Life Ins. Co.*, 108 Vt. 421, 188 A. 897; *Penn Mutual Life Ins. Co.* v. *Mulvaney*, 221 Iowa 925, 265 N. W. 889; *New York Life Ins. Co.* v. *Kincaid*, 122 Fla. 283, 165 So. 553; *National Life Ins. Co.* v. *Hood's Adm'r.* 264 Ky. 516, 94 S. W. 2d 1022; *Pedron* v. *Olds*, 193 Ark. 1026, 105 S. W. 2d 70; *Wentworth* v. *Equitable Life Assur. Soc.*, 65 Utah 581, 238 P. 648.

At all events, the rule seems to be clearly established by authority and comports with reason and the law of contract that when the insured contracts that he may exercise certain rights without the consent of the beneficiary, he may do so even to the extent of entirely destroying whatever rights she may have, whether vested, contingent, inchoate, or expectant; and we so hold.

The third proposition of respondent is that the surrender rights remained in the beneficiary until the company paid the cash due from the reserve values. We shall couple with the consideration of this proposition the affirmative one made by appellant, that the surrender in this case was complete when the election was made by delivery of the policy to the company. Since the policy in this case reached the hands of the company, we do not need to consider those cases where it was mailed and recall by telegram or letter made before it reached the company.

It will be noted from the policy that the option to surrender and receive the cash surrender value is one which can be exercised irrespective of the assent of the insurance company. It is not governed by the rule of sale which holds that where goods are sold for cash title will not be considered as having passed until the cash is paid. While the policy states that the "Insured may * * * surrender the policy, and (1) Receive its cash surrender value," it does not say that he should receive it contemporaneously. It is difficult to see how the company could write several alternatives for the surrender of the policy without putting in the words, "Receive its cash surrender value." Respon-

dent contents that if delivery of the policy and the reception of cash were not to be simultaneous but the company was to have time after delivery of the policy to pay the surrender value, it should have so stipulated. Perhaps the insured might have insisted on a contemporaneous transaction, but the fact is that he did not do so. He sent the policy in with a request for the net due to him from his reserve. This was an unequivocal election to terminate the policy and accept its cash surrender value less his indebtedness. Only eight days passed between this act and his death, not an unreasonable time in which to put the policy through the process of audit and to return the cash. But if it were contemplated that the insured might demand payment of the surrender value contemporaneous with the delivery of the policy, he did not require it. He made his election. It is unfortunate that he did so in view of his unexpected demise so soon thereafter. But that fact cannot affect the election. He gave up his policy, made his election to take the cash surrender value, and the company could do nothing else than to send it to him or his personal representative. It had no choice. He or his representative could enforce the duty by suit. Whether the election might be recalled for failure to pay or tender within a reasonable time is not involved in this suit.

In the case of *Pacific States Life Ins. Co.* v. *Bryce*, 67 F. 2d 710, 711, 91 A. L. R. 1446, written by Judge McDermott of the Tenth Circuit Court of Appeals, the facts were substantially as in the case at bar. They appear from the quoted portion of that decision. The court said:

"The pleadings tender the simple issue as to whether the policy was effectively surrendered prior to the death of the insured. The facts are stipulated. A net reserve of $435.00 had accumulated on this policy by February 3, 1932, the premium paying date. The policy accorded the insured three elections as to this reserve: It could (1) be withdrawn in cash, or (2) used to purchase a paid-up policy for a reduced amount, or (3) used to purchase extended insurance for the face of the policy for a limited term. In the absence of such election, feature (3) became automatic. * * *

"On January 18 [1933] the insured mailed the policy to the company with the statement that he would like to cash it in on February 3 [1933], the next premium date. * * * The company then mailed him, on February 9, a form of agreement which recites that the 'sole owners of Policy No. 8549 * * * have this day surrendered said Policy in consideration of its cash value, which at this time amounts to Five Hundred Eighty-five and no/100 Dollars.' * * *

"This agreement was executed by the insured and also the plaintiff, although she was neither an assignee nor an irrevocably named beneficiary. On February 24, the company acknowledged receipt of the surrender agreement and advised that by reason of the congestion in its Loan Department, some delay would ensue in remitting the cash, but that check would go forward as soon as the application was reached in its turn.

"The insured took no further steps in the matter. After his death on March 28, the company mailed a check for the surrender value on April 8. * * * Demand was made for the payment of the face of the policy, refused, and this suit followed. * * *

"Plaintiff's theory, adopted by the trial court, is that the execution of the surrender agreement was an offer by the insured to the company to surrender the policy for a cash payment of $435.00; that such offer lapsed and the surrender agreement voided because the surrender value was not paid within a reasonable time or before the death of the insured.

"With this construction of the policy contract we are not in accord. It puts the cart before the horse. The policy vested in the insured certain definite rights, among them the right to be paid the reserve on his policy in cash upon a surrender of his policy, if demanded within a specified time. The insured did demand the surrender value within the prescribed time, and surrendered his policy. When he did so—a month before his death—he became absolutely entitled to payment in cash of $435.00. Upon his death his estate, and not his beneficiary became entitled to that sum. The offer is contained in the policy contract, and is from the company to the insured; the option is in the insured and not the company, and his acceptance completes the contract; the company has no right to accept or reject; its obligation to pay is absolute. Under plaintiff's theory, an insured may only offer to surrender his policy for its cash value; the company may then accept or reject the offer, and if it fails to pay as agreed, the offer lapses. Such a construction would wipe out the right of an insured to the cash surrender value of his policy, because the company could defeat his right by rejecting his offer, or by failing to pay. To construe an exercise of an option as an offer to the company, subject to rejection or lapse, would be to warp the plain terms of the contract

and to deny the insured a right he has paid for. If Bryce, on March 15, had sued the company for $435.00, could the company have defended on the ground that it had not accepted his offer to take the cash surrender value? Clearly not; yet plaintiff's contention comes down to that."

Respondent both criticizes this case and attempts to distinguish it from the one at bar. The criticism is hurled at the ground for the decision mentioned in the Bryce Case, i. e., that there was a continuous irrevocable offer on the part of the insurer to pay the cash surrender value upon delivery of the policy, and that insured's acceptance completed the contract. We have no disposition to battle for this conception. It seems sufficient to us to hold that by the contract the insured had a right to elect to surrender the policy and receive the net surrender value and that the transactions of delivery or surrender and reception of the money were not required to be contemporaneous, at least if he did not insist upon it. We think the Bryce Case correctly decided on the principle that the surrender by the insured was complete when he delivered the policy to the insurance company with request for payment of its cash surrender value.

The cases of *Bibbo* v. *Penn Mutual Ins. Co.*, 241 App. Div. 423, 272 N. Y. S. 374; *Lipman* v. *Equitable Life Assur. Soc.*, 4 Cir., 58 F. 2d 15; *Lauer* v. *Michigan Life Ins. Co.*, 268 Mich. 614, 256 N. W. 567; *Manhattan Life Ins. Co.* v. *Allison*, 100 Colo. 1, 64 P. 2d 1265, are in point. In some of these cases there was a definite period named within which the payment could be made. Respondent distinguishes those cases on that ground, contending that there was a contract for credit. In this case, the insured by mailing the policy impliedly acquiesced in giving a reasonable time to make payment, if, indeed, such time may not be implied from the very nature of the transaction of surrender.

The case of *Northwestern Mutual Life Ins. Co.* v. *Joseph*, 103 S. W. 317, 31 Ky. Law Rep. 714, 12 L. R. A., N. S., 439, cited by appellant, did revolve, as suggested by respondent,

around the question of whether the mailing of the election made was binding and irrevocable so that it could not be recalled before reaching the company. But, certainly, a holding that the mailing itself constituted a binding and irrevocable election would be authority for the stronger situation that when the policy and election reached the company it would be binding and irrevocable. The same may be said of the case of *Tucker* v. *Equitable Life Assur. Soc.*, 174 La. 598, 141 So. 71. *Cooper* v. *West*, 173 Ky. 289, 190 S. W. 1085, rested on the general principle laid down in the Joseph Case, supra. The case of *Pequot Mfg. Corporation* v. *Equitable Life Assur. Soc.*, 253 N. Y. 116, 170 N. E. 514, is in accord with the principle herein laid down.

The court in *State Life Ins. Co.* v. *Finney*, supra, held that a condition in the policy that insured elect within a certain time was waived by the insurer and that a letter thereafter by insured, when the time limit for election had been waived, stating that he elected to take the money without any surrender of the policy, was an election which prevented suit for the face value of the policy because ·of his death before payment by the company. *McCormick* v. *Travelers' Ins. Co.*, 215 Mo. App. 258, 264 S. W. 916, supports the rule above announced. The case of *Fidelity Mutual Life Ins. Co.* v. *Merchants' & Mechanics' Bank*, 5 Cir., 71 F. 2d 777, cited by respondent, is clearly distinguishable from the case at bar.

The contention of respondent that only the beneficiary had the right to elect and that the insured had merely a power which he could not exercise without her consent has been answered by our holding that under the policy the insured could exercise the right of surrender independently of the beneficiary. In *Rawson* v. *John Hancock Mut. Life Ins. Co.*, 288 Ill. App. 599, 6 N. E. 2d 474, it was held that the options after default were personal to the insured and could not be exercised by any one after his death. The weight of authority is clearly in favor of that rule, especially under a policy reading as did

the miscellaneous provisions of section 6 of this policy, above set out.

It follows that appellant must prevail in this appeal. An examination of the last ten lines of paragraph 5 and all of the allegations of 6 and 7 of plaintiff's complaint sufficiently reveals the fact that plaintiff relies entirely upon the proposition that the insurance features of the policy were still in force and that the policy was obtained by the insurance company by "fraudulently and mistakenly" representing to the deceased that it had lapsed by nonpayment of premium and that it would be necessary for him to complete an application for reinstatement and furnish evidence of insurability satisfactory to the defendant before the policy would have any force and effect; and further, that defendant "unlawfully and wrongfully claimed that said policy of insurance had been canceled and terminated prior to the death of Feramorz Decker, and has unlawfully, wrongfully and fraudulently kept possession of said policy, denying all liability to the plaintiff by reason thereof."

If the allegations of the answer are correct, the defendant was not mistaken in the representations made, granted the same were made as alleged, and that the defendant did not unlawfully and wrongfully claim that the policy of insurance had been terminated prior to the decedent's death, because, if the allegations of defendant's answer are correct, it was terminated prior to the death.

But the whole case is simply in the stage of the pleadings. The ruling which sustained plaintiff's demurrer to defendant's answer must be reversed, with instructions that said demurrer be overruled. Plaintiff has replied so the case is at issue. Plaintiff has the right to require defendant to prove by evidence the allegations regarding surrender of the policy. For this reason, the case must ■ be reversed, with instructions to set aside the order sustaining the demurrer of plaintiff to defendant's answer and to overrule said demurrer and admit the parties to

proof. Such is the order. Costs are allowed to appellant. Amicus curiae to pay their own costs.

FOLLAND, C. J., HANSON, MOFFAT, and LARSON, JJ., concur.