ELLIS, Judge.
The plaintiffs herein are six industrial .life insurance companies which were first authorized as such by Act 65 of the Legislature of Louisiana for the year 1906, and by that Act and the amendments thereto are defined to be those companies which sell insurance for which the stipulated premiums are payable every four weeks or a lesser term, and the policies are for the sum of $1,250 or less, on a single life, *466 and which policies provided for a weekly-cash benefit for a disability caused by sickness or accident of $20 per week, or less, or to provide for the attendance of a physician or the supplying of drugs or the furnishing of a funeral.
Act 65 of 1906 has been amended by Act 240 of 1916, Act 148 of 1936, Act 340 of 1942, and Act 195 of 1948, which latter is known as the Insurance Code, Louisiana Statutes Annotated — Revised Statutes, Title 22. All of these acts specifically authorized such insurance companies to issue policies providing for the payment of cash sums or “provide for the attendance of a physician or supplying of drugs, or furnishing a funeral.” Act 195 of 1948 broadened the provision to “Provide for the payment for or furnishing of a funeral, all as herein limited and provided.”
The plaintiffs, in order to fulfill the terms of the contract of insurance which provided for the furnishing of a funeral, entered into contracts with funeral homes at discounts ranging from 25% to 70% off the retail value of the funeral as stated in the policy. For example, the insurance company would sell a burial benefit policy to an insured in which the company agreed that:
“⅜ * * immediately upon receipt of due proof of the death of the Insured while this Policy is in full force and effect, agree to provide a Designated Official Funeral Director who will furnish and conduct a funeral for the Insured as follows:
“Schedule A
“(1) Embossed Grey Tharson or Plain Grey Analea Cloth Covered Casket, outside box, adult burial garment, funeral car, three limousines, transferring remains, flower car, velvet drape or palm decorations (when available), door badge, veiling, candles or vigil lights, embalming, bathing, dressing, shaving, burial permit, two local press notices and acknowledgment cards, all to be furnished by the Company’s Designated Official Funeral Director.
“(2) Or $300.00 allowance on any other more expensive funeral service selected, provided the Company’s Designated Official Funeral Director wholly furnishes and conducts the funeral service. This allowance shall not be in addition to the funeral service described in No. 1 above, but in lieu thereof.
# * * * * *
“Funeral Benefit “$300.00”
Then, this insurance company, in order to fulfill the terms of its contract with the insured, would enter into a contract with a funeral home to furnish the funeral as detailed by the contract of insurance at a discount of, say, 50% or $150. Instead of using the stated or face value of the funeral benefit as shown by the policy of insurance as the basis for calculating the reserve, which is the amount of the premium that the insurance company must invest at a specified earning rate of interest in order to fulfill its commitment to the insured under the policy, these insurance companies have used the cost to them of furnishing the funeral benefit under the terms of the policy as shown by the contract with the funeral director in effect at the time of the issuance of the policy.
Using the same example as -above, where the funeral benefit on the face of the policy was stated as $300 and the contract with the funeral home or director to provide this funeral was $150, the insurance company used the $150 as the basis of their liability in calculating the necessary reserve.
On November 30, 1948, Hon. Wade O. Martin, Jr., Secretary of State and Ex-Officio Insurance Commissioner, addressed the following letter to the Delta Life Insurance Company, (formerly Tharp-Son-theimer Industrial Life Insurance Company) of New Orleans, Louisiana:
“Delta Life Insurance Co.
“New Orleans, Louisiana
“Gentlemen:
“This letter is addressed to you as your company was one of those represented at the conference held in my office on November 16, 1948. At that conference, you, through your repre *467 sentatives, asked the Department for a statement of its position with respect to the payment of cash surrender values and nonforfeiture benefits under burial policies on a reserve basis less than one hundred per cent (100%) of the legal minimum reserve required under the statutes of this State. As stated to you at that conference, there has never been any interpretation by this Department of any of the insurance laws of this State, prior to Act 195 of 1948; or since, which was not in accord with the laws of this State or which did not require cash surrender values and other non-forfeiture benefits on burial insurance policies to be computed and paid upon the basis of one hundred per cent (100%) of the reserve calculated according to the table specified in the policy or the American Experience Table of Mortality with interest at 4% per annum, whichever was the greater.
“It comes as quite a surprise to me to have you or any of the other companies represented m%ke a representation to me that this question was open to any doubt. This interpretation was so clearly established that a number of the companies present at the November 16, 1948 conference prevailed upon the 1948 Legislature to accept an amendment through the Code, in order to change this on future policies, and this was done, as you know, over the objection of the Insurance Department. Although this matter was so well settled as to require, in my opinion, no necessity for a legal instruction thereon from the Department, it is a matter of record that at all conferences which we held with representatives of your companies, and at which the drafting of Act 121 of 1946 was considered, the position of the Department that all cash values and other non-forfeiture benefits must be made on the basis of the legal minimum reserve required by law, i. e., one hundred per cent (100%) reserve computed on the American Experience Table of mortality with interest at 4%, or a higher table if specified in the policy.
“In addition, under date of November 20, 1946, a policy form manual was issued over my signature and sent by mail to each industrial company doing business in this State, which contained this provision:
“ ‘20. Cash Values (Industrial “Burial”).
“ ‘The cash values granted in burial policies shall be identical with the cash values given in identical contracts where the benefits are paid in cash. The fact that the law permits the measuring of the solvency of an industrial insurance company granting burial benefits on the basis of only 75% of the reserve under certain conditions does not permit the granting of a cash value on the basis of 75% of the reserve.’
“There has been no contrary interpretation written or otherwise issued by me or by my Department with respect to this matter.
“After the passage of Act 195 of 1948, the policy form manual, dated August 21, 1948, was issued to you and to every industrial company doing business in this State, Provision 18 of which reads as follows:
“ ‘18. Reduced Non-Forfeiture Values — Section 7.06.
“ ‘If the non-forfeiture values granted in funeral policies are based on reduced reserves under Section '5.02, then it will be necessary to so state specifically, in clear and appropriate words. If only the table for the automatic non-forfeiture option is given in the policy, as is permissible, the definition of the value of the other options must make it clear that they are mathematical equivalents.
“ ‘Policy must also contain provisions that: (1) such reduced values are dependent upon the existence and continuation of a contract with a funeral home filed and approved as required by law, and (2) they are subject to in *468 creases in cases of cancellation or changes in such contract.
“ ‘In case reduced reserves are used in the computation of non-forfeiture values in funeral policies, complete tables of such options, as are not shown in the policy, for all ages from the Sth to the 20th year must be filed ■with the Department for its permanent files.’
“The above provides the only method in which a policy may be issued which would permit the payment of non-forfeiture benefits on burial policies in a reduced amount. No policies conforming to Requirement 18 quoted above have been submitted to or approved by this Department to date. Hence, there are no policies on which reduced cash surrender value settlement may be made.
“Obviously, the provisions of Sections 5.02 and 7.06 of Act 195 of 1948 would have no retroactive effect on insurance contracts previously issued and still in effect. Likewise, the fact that your company may have improperly settled cash surrender values in the past and such fact escaped the attention of this Department in its prior examinations, either through confidence in a company’s observance of the statutes and our departmental directives, or through oversight on the part of our examiners, constitutes no approval of this practice which has been specifically condemned on each and every instance when it has been brought to my attention or that of the members of my Department.
“In accordance with the above, you are therefore instructed to review all cash surrender payments made by you and to pay any additional amount which is found to be due, and to furnish this Department with written evidence that this has been complied with not later than January 15, 1949.
“Yours very truly,
“(sgd) Wade O. Martin, Jr.
“Wade O. Martin, Jr.
“Secretary of State and Insurance Commissioner”
In accordance with Section 29.01 (a) of the Louisiana Insurance Code the plaintiffs, having been aggrieved by the action taken by the Insurance Commissioner as contained in his letter-directive dated November 30, 1948 with reference to cash surrender and reduced non-forfeiture values of funeral benefit policies demanded a hearing, and in the brief of the Delta Life Insurance Company submitted in support and substantiation of its specification of errors as set forth in its demand for a hearing, it respectfully requested that an order be issued by the Insurance Commissioner,
“(1) Withdrawing the letter-directive of date, November 30, 1948, and paragraph eighteen of the policy manual of August 23, 1948;
“(2) Providing that all reserves be computed on the basis of the contract with the funeral director in effect at the time the several policies were issued;
“(3) Providing that non-forfeiture values be computed on the basis of such reserves less a surrender charge as provided by láw.”
All other plaintiffs made substantially the same request.
The hearing was granted and began on February 15, 1949 and was continued from time to time and when finally completed the relief sought by the plaintiffs was denied, whereupon they instituted separate suits under authority of Chapter 29, Section 29.10-29.15, of Act 195 of 1948, known as the Louisiana Insurance Code, which were consolidated in the lower court as well as in this court, in which these industrial life insurance companies sought to obtain a preliminary injunction restraining and enjoining the Secretary of State and Ex-Officio Insurance Commissioner from enforcing an order issued March 7, 1950 as a result of the hearing which directed the plaintiffs to comply with the letter-directive of November 30, 1948.
The plaintiffs contended in the district court that the Insurance Commissioner was without jurisdiction to order them to review all these surrender payments made *469 by them and to pay any additional amount which might be found to be due to such surrendering policy holders for the reason that the Insurance Commissioner by such order was usurping a judicial function; that the only way the rights of a policy holder could be^settled would be by the institution of a suit against the insurance company and a judgment of a competent court. . The companies also plead in the district court that the proper basis of value for calculating the reserve in order to arrive at the proper cash surrender value of the policy was the amount stated in the contract between the company and the funeral home and not the stated face value of the funeral benefit as shown by the policy. These companies also plead as a bar the doctrine of “contemporaneous construction”.
The matter was submitted to the district court on the record as made up on the hearing before the Insurance Commissioner, and the learned judge of the lower court, with written reasons, held that in his opinion “the directive of the Insurance Commissioner dated March 7, 1950 is illegal and contrary to law”, and therefore rendered judgment enjoining the Insurance Commissioner from enforcing or attempting to enforce the letter-directive of November 30, 1948 and his order of March 7, 1950 in any manner or degree whatsoever.
The defendant Insurance 'Commissioner has appealed from this judgment.
There are three questions to be decided in this case, viz.:
(1) Did the Insurance Commissioner exceed the authority and power vested in h'im under the Louisiana Insurance Code in the order contained in his letter-directive of November 30, 1948;
(2) Whether the value of the funeral benefit as stated in the policy or the amount stated in the contract between the insurance company and its official funeral director for furnishing the funeral shall be taken as the liability of these insurance companies to be used as the basis for calculating the reserve necessary to discharge their liability under one of the non-forfeiture provisions of the law and policy, viz., the cash surrender value;
(3)Is the order of the Insurance Commissioner as to policies written after the effective date of Act 195 of 1948 that cash surrender values cannot be based on the legally authorized reserves of 75% of the stated value of the policy unless the policy exactly so states in language described by the commissioner within the authority granted him by the Louisiana Insurance Code.
The Insurance Commissioner as well as any other administrative officer has only such power and authority as is especially granted-him by legislative act by the Constitution of the State or which must be implied to carry out his express authority. See opinion of Board of Insurance Commissioners v. Texas Employers Insurance Association, Tex.Civ.App., 189 S.W.2d 47, Id., 144 Tex. 543, 192 S.W.2d 149, and Lawyers Title Insurance Corporation v. Board of Insurance Commissioners, Tex.Civ.App., 207 S.W.2d 972, and authorities cited therein.
Section 31.12 of our Insurance Code, Act 195 of 1948, reads as follows:
“Suspension or revocation of insurers’ license. The Secretary of State may refuse to renew, or may suspend, or revoke the certificate of authority of any insurer violating any of the provisions of this Code, when such violations, in his opinion, after a proper hearing, warrant the refusal, suspension, or revocation of such certificate of authority. Such hearing shall be held in the manner provided in Part XXIX.”
Thus it is clearly stated that the Secretary of State is charged with the duty of enforcing the provisions of the Insurance Code with the right of refusal to renew, or to suspend, or to revoke the certificate of authority of any insurer if such violations in his opinion warrant such action.
That portion of his order in the letter-directive of November 30, 1948 wherein the plaintiffs were “instructed to review all cash surrender payments made by you and to pay any additional amount which is found to be due and to furnish this department with written evidence that *470 this has been complied with not later than January 15, 1949" cannot be considered alone but must be considered in the light of the entire letter-directive. When so considered it is clear that the Insurance Commissioner has charged the plaintiff companies with violating the law prior to the adoption of Act 195 of 1948, our Insurance Code, in not using the stated or face value of the funeral benefit as shown by the policy of insurance in calculating cash surrender values and has ordered these companies to, in effect, review all cash surrender payments made by them and to use the stated or face value of the funeral benefit as shown by the policy in calculating the cash surrender value and upon this basis to pay any additional amounts which might be found to be due. It is admitted that these plaintiffs have all used as a basis of their liability to the policy holder the cost to them of providing or furnishing the funeral as shown by their contract with their official funeral director, which was invariably for a smaller amount than is shown on the face of the policy. Each funeral home with which the plaintiffs dealt gave a discount, varying from 25% to 70% of the stated value of the funeral benefit as shown in the policy. It is, therefore, obvious that tire Insurance Commissioner is charging these plaintiffs with violating the law, which would come within his authority as Insurance Commissioner, prior to and since the adoption of the Insurance Code as to the calculation of reserves for payment of cash surrender values, but that portion of his order which instructs them to pay any additional amounts found due the policy holders is, in our opinion, a judicial function. .We believe that the District Judge has correctly decided this point. He held:
“However, this Court knows of no law and none has been cited which authorizes our Insurance Commissioner to determine the individual rights between a policy holder and his insuror. This is a right reserved to the courts. Defendant here contends that his order directing the plaintiffs to review all cash surrender payments, and to pay additional amounts where the computation has been contrary to his formula, is not determining individual rights between policy holders and the company because his directive is applicable to all. Actually, however, in effect he is determining the rights of all policy holders who have surrendered their policies for a cash surreftder value and, although he does not name them individually the effect would be identical if he had done so, because each of the plaintiffs must check by name and refund to or pay by name to policy holders who have surrendered their policies for cash.”
Plaintiffs and the defendant are in agreement that a policy holder would not be bound as a result of the Insurance Commissioner’s order by any amount recalculated as the cash surrender value in accordance with the order. He is not a party to these proceedings and his rights could only be settled by a direct action. As stated, the individual rights of the policy holder can only be settled by a judgment of a competent court, and insofar as his letter-. directive orders the payment of any additional amounts to policy holders who had previously received the cash surrender value of their policies, it exceeds the Commissioner’s authority and is null and void.
It is, therefore, necessary that we decide the second question presented, as to whether the companies have used the correct amount as the basis of their liability in calculating their reserves for the payment of cash surrender values.
It is admitted by all parties to this suit that the minimum cash surrender value which the law requires on funeral benefit policies is the reserve less the surrender charge permitted by law. In order to arrive at the proper reserve it is necessary that a figure representing the liability of the insurance company be used to calculate the net premium which is the necessary ■amount that the insurance company must invest at a specified earning rate of interest in order to fulfill its commitments to the insured under the policy. The remainder of the premium is the amount necessary to cover the cost of doing business and any excess is the company’s profit.
*471 Non-forfeiture benefits or provisions in insurance policies, and it is with only one that we are directly concerned, viz.: “cash surrender value”, were first required under and by virtue of Act' 193 of the Legislature of Louisiana for the year 1906 in Section 2 thereof which provides:
“Be it further enacted, etc., That no policy of life or endowment insurance (other than a term policy for twenty years or less) issued by any legal reserve life insurance company on or after January first, nineteen hundred and seven, after being in force three full years shall by its terms lapse or become forfeited by the non-payment of any premium or any note therefor, or of any loan on such policy or of any interest on such note or loan. The reserve on such policy computed according to the standard adopted by said company, together with the value of any dividend additions upon said policy, after deducting any indebtedness to the company and one-fifth of the said entire reserve, shall upon demand with surrender of the policy be applied as a surrender value as agreed upon in the policy, provided that if no other option expressed in the policy be availed of by the owner thereof, the same without any further act on the part of the owner of the policy, shall be applied to continue the insurance in force at its full amount including any outstanding dividend additions less any outstanding indebtedness on the policy, so long as such surrender value will purchase nonparticipating temporary insurance at net single premium rates by the standard adopted by the company, at the age of the insured at the time of lapse or forfeiture, provided in case of any endowment policy if the sum applicable to the purchase of temporary insurance shall be more than sufficient to continue the insurance to the end of the .endowment term named in the policy, the excess shall be used to purchase in the same manner pure endowment insurance payable at the end of the endowment term named in the policy on the conditions on which the original policy was issued, and provided further that any attempted waiver of the provisions of this paragraph in any application, policy or otherwise, shall be void, and provided further that any value allowed in lieu thereof shall be at least equal to the net value of the temporary insurance or of the temporary and pure endowment insurance herein provided for. Tire term of temporary insurance herein provided for shall include the period of grace, if any.”
It can readily be seen from the portions of the law applicable to non-forfeiture benefits that by Act 193 of 1906 and the amendments thereto, a citation of which is unnecessary, each owner of an insurance policy which had been in force for the required number of years and who failed to pay his premiums and surrendered his policy was entitled to the non-forfeiture benefits provided by law, viz., either a cash surrender value, extended term insurance, or paid up insurance. The company in such a case is relieved of its original liability but should the policy holder choose to be paid the cash surrender value he then receives the reserve which the company has set aside in accordance with law, to take care of its liability under the contract of insurance, less a surrender charge in the amount allowed by law.
In the present case, the Insurance ’Commissioner is not objecting to the method used by the companies in calculating the reserve but is objecting to the use of the amount for furnishing the funeral as shown by the contract between the insurance company and its official funeral home as the insurance company’s liability under its insurance contract and used as the basis for calculating the necessary net premium to be deposited or set aside by the insurance company and which constitutes the reserve which is intended to eventually discharge the full liability of the company or to be sufficient to discharge any one of the non-forfeiture provisions of the policy.
In answer to this contention of the Insurance Commissioner, the plaintiffs herein say that the full measure of their liability is the cost of furnishing a funeral as described in each policy and as shown *472 by contracts introduced in evidence between the funeral home and the insurance company and not the value of the funeral as stated or shown on the face of the policy which is a retail value, that is, the amount which it would cost the insured. Secondly, the insurance companies further object to the contention and order of the Insurance Commissioner on the ground that up until 1946 there was no law which fixed the liability of the company as contended by the Insurance Commissioner to be the stated face value of the funeral benefit as shown in the insurance policy but, on the contrary, as the law was silent on this point that prior insurance commissioners as well as the present Insurance Commissioner, up until August 1945, recognized and approved the liability of the insurance company as the amount it had to pay its official or designated funeral home for furnishing the funeral as detailed in the policy of insurance and as set forth in the contract between the official designated funeral home and the insurance company and, therefore, under the well-established doctrine of contemporaneous construction the Insurance Commissioner cannot now change his, as well as prior Insurance Commissioners’, interpretation to the detriment and prejudice of these companies who have for so many years relied upon such rulings and as a measure of their liability used the cost to them of furnishing or providing the funeral as a basis for calculating their reserves which were established in accordance with law for the purpose of discharging its full liability or settling its obligation under the non-forfeiture provisions of the policy.
Act 65 of 1906 which first defined industrial life insurance companies has been enacted and re-enacted on three separate occasions. The first was Act 148 of 1936 and Section 3 of that Act made the following amendment:
“ * * * Every industrial life insurance policy or benefit certificate providing for the furnishing of a funeral shall specify therein those things which shall constitute the funeral to be furnished, and shall provide for a stated cash payment in lieu of such funeral in the event a change of domicile of the assured has made it impractical for the company to furnish such funeral.”
Under Act 115 of 1946, Section 3 provided in part:
“ * * * Every industrial life insurance policy or benefit certificate providing for the furnishing of a funeral shall specify therein those things which shall constitute the funeral to be furnished, and shall provide for a stated cash payment which shall not be less than seventy-five per cent (75%) of the value of the 'funeral as stated in the policy in lieu of such funeral in the event a change of domicile of the assured has made it impractical for the company to furnish such funeral.”
The amendment in 1948 which is the Insurance Code, § 703, provided the following change in this original 1906 Act:
“Every funeral policy shall state in dollars the value of the funeral and shall specify therein those things which shall constitute a funeral to be furnished, and shall provide for a stated cash payment which shall be not less than seventy-five per cent of the value of the funeral as stated in the policy in lieu of such funeral in the event it is impossible or impractical to furnish such services as set forth in the policy.”
The 1948 Act also changed the language “provide for the furnishing of a funeral” to “Provide for the payment for or furnishing of a funeral”. Section 7.01.
Thus, from 1906 to 1936 industrial insurance companies were authorized to provide in their policy for the furnishing of a funeral without specifying those things which should constitute the funeral to be furnished or the dollar value thereof.
It is true that the plaintiff companies, according to the oral testimony and the exhibits, did in practically all circumstances state in the funeral benefit policy the value of the funeral which was to be furnished and, likewise, in most instances provided that where it was impractical to furnish the funeral because of a change of domicile of the insured or for some other reason, that the cash payment of a certain *473 amount was to be paid, usually a much lesser sum than the stated value of the policy.
Up until Act 121 of 1946 the Acts of the Legislature were silent as to whether the amount stated in the policy or the cost of actually furnishing the funeral as shown by the amount stated in the contract with the funeral home should be used as the liability of the company for the purpose of establishing its reserves and eventually the discharge of any obligations under the law. Under the terms of the 1946 Act the Legislature fixed the reserve on funeral policies at 75% of the stated value of the policy, thus recognizing a discount of 25%, and this would definitely fix the liability of the company at 75% of the value of the funeral policy, regardless of any contract with the funeral home.
It might be well at this time to quote Act 121 of 1946 on this point. Under Section 2 it provided:
“(1) Upon receipt of such report, the Secretary of State shall make a valuation of the policies and annuities of each company, and shall ascertain the re-insurance reserves and surplus of every such company. All such valuations shall be in accordance with the terms of the respective contracts on the net premium basis.
******
“(5) Provided, however, that in the case of Industrial Life Insurance Companies and Service Insurance Companies chartered by this State, the Secretary of State shall, from and after July 29, 1947, permit the following reduction in the reserves of such companies, computed in accordance with this act, for the purpose of determining their solvency:
“(a) On all policies issued by such companies prior to January 1, 1937, which provide for the furnishing of a funeral as the obligation of the company to the insured and his beneficiary, a reduction not to exceed seventy per cent (70%) of the reserve as computed in accordance with this act.
“(b) On all policies issued by such companies from January 1, 1937, to December 31, 1946, inclusive, which provide for the furnishing of a funeral as the obligation of the company to the insured and his beneficiary, a reduction not to exceed forty per cent (40%) of the reserve as computed in accordance with this act.
“(c) On all policies issued by such companies on or after January 1, 1947, which provide for the furnishing of a funeral as the obligation of the company to the insured and his beneficiary, a reduction not to exceed twenty-five per cent (25%) of the reserve as computed in accordance with this act.
“(d) Provided, that in all cases, this reduction shall be allowed only where the insurance company produces satisfactory proof of a contract with an authorized funeral director who is capable of furnishing the service specified in the policy, allowing a discount for the furnishing of the service specified therein, and in no case shall the reduction allowed herein exceed the amount of the reduction allowed in such contract.
“(e) For a period of five (5) years, beginning July 29, 1947, on all policies issued by such companies prior to January 1, 1937, which provide in whole or in part for cash benefits as the obligation of the company to the insured and his beneficiary, a reduction not to exceed fifty per cent (50%) of the reserves on the cash portion of the policies, as computed in accordance with paragraphs (1), (2), (3) and (4) of this section.
“(f) Provided, further, that such reduction shall only be granted to those companies who agree by an instrument in writing, filed with the Secretary of State, to apportion to and to maintain in a separate reserve fund, and who actually do apportion to and maintain in a separate fund, at least two per cent (2%) of their annual gross premium income, for the purpose of bringing up the reserves to which the above reduc *474 tion would apply on all funeral policies to seventy-five per cent (75%), and on all policies providing in whole or part for cash benefits to one hundred per cent (100%), of the full reserve on that portion of funeral policies providing for cash benefits, as computed in accordance with paragraphs (1), (2), (3) and (4) of this section, the aforesaid two per cent (2%) to be in addition to any normal increase in reserves during the year.”
We find the above quoted provisions of Act 121 of 1946 with a slight change in wording re-enacted in Act 195 of 1948, § 5.02, our present Insurance Code. One apparently material difference in Act 121 of 1946 and our Insurance Code is the deletion in the latter of the language “for the purpose of determining their solvency”. Both acts provide for the reduction only where the insurer produces satisfactory proof of a contract with an authorized funeral director who is capable of furnishing the service specified in the policy, allowing a discount for the service specified therein, and in no case shall the reduction allowed in the Act exceed the amount of reduction allowed in the contract between the authorized funeral director and the industrial insurance company. Also, both acts provide that the reduction allowed therein should only be granted to those insurers under certain conditions, Section 2(5) (f) and both acts fix the maximum discount at 25%.
It is, therefore, necessary that we decide which of the two amounts, that contended by the Insurance Commissioner or that contended by the plaintiffs, should be considered as the liability of the companies prior to the enactment of Act 121 of 1946, for at that time the Act specifically fixed the liability of the company and that cannot be changed by the Insurance Commissioner.
The law being silent, the next question to be decided is the argument of the plaintiffs that all prior Insurance Commissioners as well as the present one recognized the liability of the company to be the amount necessary to fulfill its contract of furnishing the funeral, which amount was definitely fixed and shown by the contract between the official funeral directors or homes and the plaintiffs herein.
We agree with the lower court in its finding that “the record is replete with evidence that the present insurance commissioner, as well as his predecessors, expressly authorized these plaintiffs to calculate their reserve taking into account the discounts which they received from the funeral homes with whom they had contracts” and that the action of the Insurance Commissioners through the years have been such as to prevent a sudden change in policy. They have, as is heretofore shown, allowed the calculation of reserves to be based on the cost of the funeral to the insurance company. Relying on this interpretation the companies fixed their premiums as well as their reserves. This makes the doctrine of contemporaneous construction applicable. The effect of this doctrine is that where administrative or executive departments of government have interpreted a law over a period of time, the courts, because of the injury that would result to those who have followed the administrative interpretation, will not disturb that interpretation even though they might disagree as to its correctness.
In the case of Dominion Land Co., Limited v. Stark, Tax Collector, 156 La. 124, 100 So. 244, 247, our Supreme Court stated:
“There is little if any question as to the weight to be given to the interpretation of a law, adopted by the executive and legislative branches of the government, especially when such interpretation is contemporaneous and has been followed for many years.
“In the case of State ex rel. Payne, Tax Collector v. Exchange Bank of Natchitoches, 147 La. [25] 26, 84 So. 481, where the decision was written by our present-Chief Justice C. A. O’Niell, the following appears in the syllabus:
“ ‘Though an interpretation of a law by other departments of the government does not control the judicial department, especially where the correctness of such interpretation is the subject of investigation, nevertheless when *475 officers specially charged with the observance and enforcement of a particular law have for a long time determined its meaning and acted accordingly, their interpretation is entitled to great weight.’
“In State ex rel. Guillot v. Central Bank & Trust Co. (In re Central Bank & Trust Co.), 143 La. 1053, 79 So. 857, we said, quoting from Sutherland on Statutory Construction, Par. 309:
“ ‘The practical construction given to a doubtful statute by the public officers of the state, and acted upon by the people thereof, is to be considered; it is perhaps decisive in case of doubt. This is similar in effect to a course of judicial decisions. The Legislature is presumed to be cognizant of such construction, and after long continuance, without any legislation evincing its dissent, courts will consider themselves warranted in adopting that construction.’
“See, also, State v. Comptoir National D’Escompte de Paris, 51 La.Ann. [1272] 1281, 26 So. 91.”
Also, see: United States v. Alabama G. S. R. Co., 1892, 142 U.S. 615, 12 S.Ct. 306, 308, 35 L.Ed. 1134; Reynolds v. Northern Pac. Ry. Co., 8 Cir., 168 F.2d 934; Richardson v. Liberty Oil Co., 143 La. 130, 78 So. 326; State ex rel. Porterie v. Gulf Mobile & N. R. Co., 191 La. 163, 184 So. 711, 716; State ex rel. Guillot v. Central Bank & Trust Co. (In re Central Bank & Trust Co.), 143 La. 1053, 79 So. 857; Decker, Respt. v. New York Life Insurance Company, Appt., 94 Utah 166, 76 P.2d 568, 115 A.L.R. 1377; Wysong v. Automobile Underwriters, 204 Ind. 493, 184 N.E. 783, 94 A.L.R. 826; Jackson v. Coxe, 208 La. 715, 23 So.2d 312.
The concise statement of the facts proven by an overwhelming preponderance of the evidence is contained in one of the briefs filed on behalf of the plaintiff, Delta Life Insurance Company, as follows:
“In conclusion, this record shows that from the time the Delta Company was organized in 1935, they made known to the Insurance Department the valuation basis which they proposed to follow to determine their reserve liability on their burial policies. This valuation basis contemplated the discounted or wholesale cost of the funeral service and merchandise to the Delta Company in accordance with its contract with its official funeral director. Year after year, as required by law, the Delta Company submitted its tabulations of burial insurance in force, showing the reserve accumulated against these policies on the valuation basis used by them. Year after year, the Insurance Department approved the method used by the Delta Company and renewed their certificate of authority. Time and again the Delta Company, in writing, directed the attention of the Insurance Department to the valuation method being used by them to accumulate their reserves on their burial policies, specifically pointing out to the Department that they were using the discounted figures when calculating their reserves. This record shows that the Insurance Department, itself, calculated the Delta Company’s reserves, using the discounted figures to determine the company’s reserve liability * *
There is no doubt but that the present Insurance Commissioner as well as his predecessors specifically approved of the calculation of these companies’ reserves based upon the contract value with the funeral homes.
It is further shown in this record that these companies charged a lesser premium on the funeral benefit premiums than on a cash policy of the same amount. The insurance commissioner contends that they charge from 9% to 22½% less, while the plaintiffs approximate the difference in the rate at 22½%. Had the Insurance Commissioners notified these companies that they expected their reserves on their funeral policies to be equal to their reserves on their cash policies, naturally the premiums would have had to be the same on like amounts. The mere fact that their profit might be large has no bearing upon the question at issue. That is a matter *476 of competition. Neither is it of any significance that the stockholders in the plaintiff companies are also the stockholders and in many instances, directors, in the funeral home companies. Both are separate and distinct corporations, and there is no charge of any fraud or collusion in the contracts entered into between the two corporations, and none was attempted to be proven. Therefore, that fact is of no legal significance in this case.
It seems to be the argument of the Insurance Commissioner, in answer to the doctrine of contemporaneous construction, that the reserve which the -Insurance Commissioners allowed to- be calculated, taking into account the discounts received from the funeral homes with which these companies had contracts, was only for solvency purposes and had no bearing upon the obligation of the plaintiffs as to the payment of cash surrender values. There is no evidence in this record that any Insurance Commissioner, including the present one, up until 1945 intimated that the reserves were not being calculated correctly or in specific accord with the rules and regulations of the Insurance Commissioners themselves and with the specific approval of all Insurance Commissioners, including the present Commissioner. However, the defendant now contends that in view of Section 7 of Act 65 of 1906, which provided “That no law, hereafter passed, shall be held or deemed to refer to the business of industrial life insurance unless the same is expressly referred to in said law”, that all industrial insurance companies as well as the 'Commissioners were of the opinion that Section 2 of Act 193 o-f 1906 pertaining to non-forfeiture benefits did not apply to industrial life insurance companies and, therefore, until the decision of the Supreme Court in 1935 in the Succession of Watson v. Metropolitan Life Insurance Company, 183 La. 25, 162 So. 790, and in DeCoy v. First National Life Insurance Company, 184 La. 632, 167 So. 172, these industrial insurance companies had not maintained the proper reserves, and the Insurance Commissioner, realizing the seriousness of the situation insofar as the companies were concerned if they had to immediately bring their reserves to the proper level, granted a moratorium which allowed an operation on only partial reserves, and that this moratorium was intended to expire December 31, 1941, and that the Legislature by Act 123 of 1942 granted a further period of five years after the effective date of the Act in which to comply with the reserve provisions thereof. It might be well to mention that this argument as to the moratorium and calculation of reserves other than as directed by law for solvency purposes is not applicable to the Delta Company. It was organized in 1935 and was fully cognizant of the Supreme Court decisions last above cited, and it is admi"'ed that they have always been solvent, and have maintained the proper reserves, provided that the interpretation of the Insurance Commissioners as to the proper amount to be used as the liability of the company for calculating reserves was correct.
While Act 123 of 1942 granted a period of five years after the effective date of the Act in which the companies were to comply with its provisions, this had no effect upon the valuation of policies by the Secretary of State. This act could not be interpreted as allowing any reduction in calculating the proper reserves. As we understand the meaning of Act 123 of 1942, the Insurance Commissioner was to properly value the policy and a proper reserve was to be calculated by the companies and the Insurance Companies were then given five years in which to build up the correct reserves.
No Insurance Commissioner, either directly or indirectly, prior to the present Insurance Commissioner’s letter of August 20, 1945 intimated that they were allowing these companies to use in calculating their reserves the amount set forth in the funeral home contract as their liability for solvency purposes only. On the contrary, this record is full of evidence that all Insurance Commissioners, including the present one, up until the time mentioned specifically approved of the method of calculating reserves and the payment of the non-forfeiture provisions of the policies by the plaintiff companies using as a basis of liability the amount shown by the funeral home contracts.
*477 The Insurance Commssioner further contends that the liability of the company is the face or stated value of the funeral as set forth in the policy contract issued to the insured and in support thereof cites the following cases: James v. Community Burial Service Corp., 5 La.App. 633; Bruce v. Kilpatrick Life Ins. Co. of La., La.App., 27 So.2d 634; Tarbutton v. First National Life Ins. Co., La.App., 17 So.2d 365; Allen v. Enterprise Benevolent & Burial Ass’n, La.App., 159 So. 127; Williams v. Unity Industrial Life Ins. Co., La.App., 181 So. 210; Walters v. Reliance Industrial Life Ins. Co., La.App., 180 So. 880.
All of these cases except Bruce v. Kil-patrick Life Ins. Co. of La., supra, were based upon the breach of the contract. In other words, they failed 'to furnish the funeral and it was necessary that a funeral be obtained at retail prices. In all these cases the cost was equal to or above the stated retail price as shown by the policy and the Court properly awarded the full amount as shown in the policy. The Bruce v. Kilpatrick Life Ins. Co. case was a peculiar one. In that case the soldier or Marine lost his life at sea and his body was never found. It is true that the court rendered a judgment for the face value of the policy, however, it will be noted that no question was raised as to the liability of the company nor was it shown what it would cost the company to furnish the funeral other than the stated value in the policy, nor was it shown that there was a contract with a funeral home to furnish a funeral. 'In other words, the defendant admitted that if there was liability it was the face value of the policy. In this case the -Court stated that the president of the funeral home practically waived his defenses. We do not believe that these cases are apposite for we are not dealing with a case measuring the liability of the company based upon a violation of its contract but we are dealing with a case which presents the question of the liability of the company assuming that it performs its contract.
As to the Insurance Commissioner’s argument or complaint that if industrial insurance companies can take into account their contracts with funeral homes in calculating reserves and paying these cash surrender values, this makes it “absolutely impossible for any insurance commissioner to properly supervise the regulation of industrial life insurance companies,” the district judge correctly disposed of same as follows:
“ * * * That such a situation will cause some argument there can be no doubt. However, Act 121 of 1946 and 195 of 1948 require these companies to build their reserves on funeral policies to 75% of the stated value of the funeral benefits and the record indicates that these plaintiffs are doing this. Furthermore, the Court has been informed that these plaintiffs are paying cash surrender values on policies surrendered regardless of the date of issue at 75% of the stated value, less the surrender charge. Even if this were not true and it was extremely difficult for the Commissioner to administer the law this would not justify the Court in changing it.”
As to the third question which we must decide which deals with the provisions of paragraph 18 of the Policy Form Manual in which the Insurance Commissioner requires certain provisions under which a policy may be issued so as to permit the payment of a non-forfeiture benefit on a burial policy in a reduced amount under Section 5.02 of the Louisiana Insurance Code, we are of the opinion that he has exceeded his authority. Under the Insurance Code Section 5.02 these companies are entitled to reduced reserves independent of any policy provision required by the Insurance Commissioner. If the policy should not contain the provisions required by the law or those authorized to be required by the Insurance Commissioner, he could not, as a penalty, refuse to allow the reduction under Section 5.02 of the Insurance Code but might exercise the right accorded him under Section 31.12, supra.
Being of the opinion that the judgment of the District Court is correct, it is hereby affirmed.